Hillsborough
No. 88-160

<h3 style="text-align:center">CENTRONICS CORPORATION</h3>

v.

<h3 style="text-align:center">GENICOM CORPORATION</h3>

August 16, 1989

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Andrew D. Dunn* and *Mark W. Dean* on the brief, and *Mr. Dean* orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Wilbur A. Glahn, III*, on the brief and orally), for the defendant.

SOUTER, J.   A contract between the buyer and seller of business assets provided for arbitration of any dispute about the value of the property transferred, to which the purchase price was pegged, and required an escrow deposit of a portion of the price claimed by the seller pending final valuation. The seller has charged the buyer with breach of an implied covenant of good faith in refusing, during arbitration, to release a portion of the escrow fund claimed to be free from "dispute." The Superior Court (*Hollman,* J.) granted summary judgment to the buyer, which we affirm.

The agreement between the plaintiff-seller, Centronics Corporation and corporations related to it (Centronics), and the defendant-buyer, Genicom Corporation (Genicom), sets the purchase price at the consolidated closing net book value (CCNBV) of the assets plus four million dollars. CCNBV is defined as the value reflected in Centronics's consolidated balance sheet as of the closing date, minus

certain liabilities. Because CCNBV could not be stated definitely in advance, the parties agreed to derive it by a series of steps that we describe here in a somewhat simplified distillation of their contract documents.

As a basis for calculations (albeit subject to later challenge), they selected the consolidated net book value to be determined from Centronics's consolidated balance sheet as of September 28, 1986, a date prior to the closing. Within thirty days of the closing, Centronics was obliged to revise the September balance sheet to reflect the results of operations from September 29 through the closing date, and, on the basis of the revision, to compute a consolidated closing net book value and consequent purchase price. Although Centronics was bound to follow "generally accepted accounting principles" in preparing both the September balance sheet and the subsequent revision, and although Centronics was required to review the latter with the Boston office of Coopers & Lybrand before delivering the revised figure to Genicom, the agreement provided that the revised balance sheet would nonetheless be unaudited and certified only by Centronics's president or principal accounting officer.

After Genicom's receipt of the revised balance sheet, the Richmond, Virginia, office of Coopers & Lybrand then had thirty days to review it on Genicom's behalf and either to accept the revision as conclusive of CCNBV and the consequent purchase price, or to propose adjustments. If the Richmond office proposed no such adjustments on Genicom's behalf, the balance sheet as revised by Centronics would determine CCNBV. If the Richmond office did propose adjustments, Centronics would then have thirty days to object to them, in default of which the balance sheet with Genicom's proposed adjustments would be conclusive. The parties agreed that any timely dispute about the consolidated closing balance sheet or the computations based upon it would be referred to a New York accounting firm for final and binding "determination in accordance with the terms of [the] Agreement," a process that each party now describes as arbitration.

Although the parties agreed to use their best efforts to promote the resolution of disputed issues within fifteen days of their submission to the arbitrator, even on the optimistic assumption that arbitration would conclude that soon the parties faced a potential delay of more than one hundred days between closing and final calculation of the purchase price. Instead of deferring all payment for such a time or longer, they agreed that upon closing Genicom would pay Centronics an amount equal to the purchase price based

on the September balance sheet, less $5,000,000 to be placed in escrow. They also agreed that if Centronics proposed revisions to the September balance sheet indicating a higher purchase price Genicom would promptly increase the escrow deposit by the difference, to be known as the Adjustment Amount.

Distribution from the escrow fund was to be governed by two sets of provisions. Insofar as the escrow agreement relates to the issue before us, it simply provided that "[i]n accordance with Section 2.07 of the Purchase Agreement, the Escrow Agent shall hold the Escrow Fund in its possession until instructed in writing" by respective New York counsel for Centronics and Genicom "to distribute the same or some portion thereof to Centronics or [Genicom] as the case may be," whereupon the escrow agent was to make the distribution as ordered. Section 2.07 of the Purchase Agreement, entitled "Final Payment of Purchase Price," began with a provision that "[f]inal settlement and payment of the Purchase Price shall be made not later than ten days after determination of [CCNBV] and computation of the Purchase Price," whether by agreement of the parties or decision of the arbitrator. There followed detailed instructions for payment out of escrow and final settlement between the parties, which are of no significance in the matter before us, being intended to provide for the payment to Centronics of whatever balance it might be owed on the purchase price, and the distribution to Genicom of any amount it might be found to have overpaid.

The parties took the first step in applying these valuation and payment provisions at the closing held on February 13, 1987. Centronics's consolidated September balance sheet showed a net book value of $72,529,000 for the assets to be transferred, to which amount $4,000,000 was added, to give a preliminary purchase price of $76,529,000. Genicom placed $5,000,000 in escrow and paid Centronics the balance of $71,529,000.

On March 30, 1987, Centronics delivered a revised balance sheet to reflect operations for the four and one-half months before the closing. The revised net book value was $83,396,000, and Genicom accordingly increased the escrow by depositing the required Adjustment Amount of $10,867,000, representing the difference between the earlier and later figures. Genicom's accountants then proposed downward adjustments to the revised figures, which would reduce the net book value, and purchase price, by $10,213,164, almost back to the earlier figure. Centronics objected, and the dispute was submitted to the arbitrator.

The arbitration had begun to drag by the summer of 1987, when Centronics sought a distribution of $5,653,836 from the escrow fund, being the difference between the total fund of $15,867,000 and the $10,213,164 in downward adjustments Genicom had proposed. Centronics described the amount requested as free from dispute and complained of a loss of economic opportunity to use the funds for its corporate purposes. Genicom replied that the purchase agreement provided for no distribution from escrow prior to determination of CCNBV and the final purchase price, which, as it turned out, would presumably be at the close of arbitration.

Centronics responded by bringing this two-count action to recover the amount in question and consequential damages. Count one alleged that Genicom had breached implicit terms of the agreement by delaying arbitration and refusing to release the presently undisputed amount from escrow. The second count characterized Genicom's action as the tortious breach of a legally-implied covenant of good faith and fair dealing (which we will speak of simply as one of good faith).

■ Although count two was ill-pleaded, given this jurisdiction's clear law that a breach of contract does not sound separately in tort, *see Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 613, 392 A.2d 576, 580 (1978), the trial court treated the covenant of good faith mentioned in count two as the term said to have been breached under count one, and we will accept that merger of pleading. Centronics's allegations have undergone further refinement by dropping any claim that Genicom acted to delay the arbitration, the sedate progress of which is now acknowledged to be neither party's fault. (Slow as it was, the arbitration may well have concluded before this decision, although Centronics's claims for interest and consequential damages suffice to stave off the threat of mootness.)

Genicom moved for summary judgment on the theory that, given the dispute over CCNBV, the terms of the parties' agreements required payments out of escrow only upon completion of arbitration, thus barring the implication of any duty to authorize a distribution before that event. Centronics objected and sought its own summary judgment, grounded on affidavits said to indicate that Genicom's refusal was meant to pressure Centronics into conceding a disputed item worth a substantial amount.

The trial court ruled for Genicom, after construing the contract to provide that the

"only way funds can be released is upon final determination of the purchase price, which, as the parties agree, is in the hands of the arbitrator.

The instant suit is no more than [an] attempt on the part of [Centronics] to rewrite the contract. Essentially, [Centronics] asks this Court to read between the lines of § 2.07 and insert therein a provision regarding partial disbursal of funds from escrow in light of the protracted arbitration. While it is true that the parties contemplated a short time period for resolution of disputes through binding arbitration, the Court cannot insert a provision in the contract for partial payments where such provision does not exist.

[Centronics] should have demanded a mechanism for partial payments from the Escrow Fund if the arbitration process lagged, or if the factual situation regarding adjustments to the final purchase price occurred as it did. The Court will not renegotiate the contract between the parties to obtain this result. To the extent [Centronics] made a less advantageous contract, it must now abide by the terms of that contract as originally agreed."

Centronics reads the foregoing order as denying that any obligation of good faith is implied in the parties' contract. We read it differently, as concluding that the express terms of the contract are inconsistent with the claim that an obligation of good faith and fair dealing, or any other sort of implied obligation, either requires Genicom to agree to an interim distribution or bars Genicom from refusing to agree except in return for Centronics's concession on a disputed item. We consequently view this appeal as raising the related questions of whether the trial judge misunderstood the implied obligation of good faith or misconstrued the contract. We conclude that he did neither.

Although an obligation of good faith is imposed by statute in the performance and enforcement of every contract or duty subject to the Uniform Commercial Code, *see* RSA 382–A:1–203, :1–201(19), the parties before us have addressed the implied contractual obligation of good faith at common law, and our first concern in this case is to identify the jurisdiction whose common law is to be applied. Although the parties agreed that their contractual relations were to be governed by New York law, and although Centronics's brief cites two cases from the Second Circuit applying the law of that State, Centronics's principal reliance is on New

Hampshire cases. Since the New York decisions are not at odds with our own, as we will indicate below, and since neither party has suggested that the relevant substantive law differs between the two jurisdictions, we will assume that to whatever extent the governing foreign law has not been proven it is identical to our own. *See Adams v. Thayer*, 85 N.H. 177, 179, 155 A. 687, 689 (1931).

Our own common law of good faith contractual obligation is not, however, as easily stated as we might wish, there being not merely one rule of implied good faith duty in New Hampshire's law of contract, but a series of doctrines, each of them speaking in terms of an obligation of good faith but serving markedly different functions. Since the time of our first contract decision couched in terms of good faith, *Griswold v. Heat Corporation*, 108 N.H. 119, 229 A.2d 183 (1967), we have relied on such an implied duty in three distinct categories of contract cases: those dealing with standards of conduct in contract formation, with termination of at-will employment contracts, and with limits on discretion in contractual performance, which is at issue in the instant case. Although decisions in the first and second categories are not directly relevant here, a short detour through their cases will serve clarity by indicating the categorical distinctions.

In our decisions setting standards of conduct in contract formation, the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it. *See Bursey v. Clement*, 118 N.H. 412, 414, 387 A.2d 346, 348 (1978). *Compare Bursey supra and Dawe v. American Universal Ins. Co.*, 120 N.H. 447, 449–50, 417 A.2d 2, 4 (1980), *with McCarthy v. Barrows*, 118 N.H. 173, 175, 384 A.2d 787, 788 (1978). In *Bursey* and *Dawe*, the continuing good faith bar to misrepresentation is antecedent to the agreement itself, a circumstance recently echoed in *Realco Equities, Inc. v. John Hancock Mutual Life Insurance Co.*, 130 N.H. 345, 350, 540 A.2d 1220, 1223 (1988), where dictum suggested that breach of an independently existing duty of good faith may be a way to explain the voidability of a contract found to be unconscionable. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 205, comment *e*.

By way of contrast, the good faith enforced in the second category of our cases is an obligation implied in the contract itself, where it fulfills the distinctly different function of limiting the

power of an employer to terminate a wage contract by discharging an at-will employee. Under the rule evolved from *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) through *Howard v. Dorr Woolen Company*, 120 N.H. 295, 414 A.2d 1273 (1980), and *Cloutier v. A.& P. Tea Co., Inc.*, 121 N.H. 915, 436 A.2d 1140 (1981), an employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy, *Cloutier, supra* at 921–22, 436 A.2d at 1143–44. Although good faith in this context has not been rigorously defined, bad faith has been spoken of as equivalent to malice, *Cloutier supra*, and treated virtually as a subject of equitable estoppel in labor relations, *Cloutier, supra* at 921, 436 A.2d at 1143. Indeed, the concepts of good and bad faith applied in these cases are best understood not as elements of general contract law as such, but as expressions of labor policy. *See Monge, supra* at 133, 316 A.2d at 551.

The differences between the obligations of good faith exemplified even in these first two groups of cases are enough to explain why the commentators despair of articulating any single concept of contractual good faith, even after the more than fifty years of litigation following in the wake of the American common law's first explicit recognition of an implied good faith contractual obligation in *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). *See* Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 VA. L. REV. 195, 196 (1968); Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization*, 67 CORNELL L. REV. 810, 819 (1982); Burton, *More on Good Faith Performance of a Contract: A Reply to Professor Summers*, 69 IOWA L. REV. 497, 511 (1984); RESTATEMENT, *supra* at § 205, comments *a, d, e.*

Even within the narrower confines of the third category of cases, those governing discretion in contractual performance, the one notable attempt to conceptualize implied good faith in a single, general definition, Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369 (1980), discussed *infra*, is opposed by the view that the obligation of good faith performance is better understood simply as excluding behavior inconsistent with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations, *see* Summers, 67 CORNELL L. REV. at 820, 826; RESTATEMENT, *supra* at § 205, comment *a.* This view is consonant with our own cases in the third category, a

canvass of which should inform our consideration of what good faith may or may not demand of Genicom in the circumstances before us.

New Hampshire's seminal case on the implied obligation of good faith performance, *Griswold v. Heat Corporation*, 108 N.H. 119, 229 A.2d 183, held that a contract to pay $200 a month for "'such [personal] services as [the plaintiff], in his sole discretion, may render'" required the plaintiff to provide a level of services consistent with good faith, *id.* at 124, 229 A.2d at 187. The court sought out the inadequately articulated objectives of the contracting parties by examining their contractual language, their prior dealings, and the commercial context in which they dealt, and found a mutual intention to be bound by a contract for actual services. *Id.* at 123–24, 229 A.2d at 186–87. The court then indicated its readiness to vindicate what it inferred to have been the parties' reasonable expectations, and so saved the agreement from the unenforceability that would have followed from finding the plaintiff's undertaking to have been as illusory as the contract literally gave him the discretion to make it. *Id.* at 124, 229 A.2d at 187. Thus, a contracting party with expressly conferred discretion to do nothing at all was denied the right to frustrate the other party's expectation of receiving some reasonable level of performance.

The discretion to refrain from acting, articulated in the *Griswold* contract, had been left unexpressed in the agreement litigated in the next case, where it resulted simply from the parties' failure to address any standard of enforceable performance on the point at issue. In *Seaward Construction Co. v. City of Rochester*, 118 N.H. 128, 383 A.2d 707 (1978), the city was obliged to pay for construction work only to the extent it received federal funds for that purpose, and the contract expressed no duty on the city's part to seek the funds, *id.* at 129, 383 A.2d at 708. When, however, the parties fell into dispute over amounts due, and the city blocked what it believed was the contractor's demand for excessive payment by the simple expedient of refusing to ask for any federal money, *id.*, this court held that the city could not rely on a lack of federal funds in defending against the contractor's claim for payment, without also proving it had honored an implied obligation to make a good faith effort to obtain the money, *id.* at 130, 383 A.2d at 708. Thus, once again, the court imposed a limitation on one party's apparent discretion to thwart a reasonable expectation of the other party, going to the essence of the contract.

The next case arose from discretion over the timing of performance. *Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 392 A.2d 576, held that an insurance company would violate an implied obligation of good faith if it delayed payment owed to its own insured for the purpose of coercing the insured into accepting less than the full amount due, *id.* at 612, 392 A.2d at 580. Under the contractual circumstances illustrated by *Lawton*, the company's discretion to set the time for payment resulted neither from express provision (as in *Griswold*) nor from simple failure to address the subject (as in *Seaward*), but from the practical impossibility of identifying the moment in advance when a reasonable person would be satisfied of the insurer's obligation to pay the policy's proceeds. Although *Lawton* is to this extent distinguishable from the preceding cases, the court's response to the risk of unlimited discretion was consistent with *Griswold* and *Seaward*, and *Lawton* may be seen as holding that under a contract leaving the time for performance unspecified, good faith limits discretion under a standard of commercial reasonableness. *See also Albee v. Wolfeboro Railroad Co.*, 126 N.H. 176, 179, 489 A.2d 148, 151 (1985) (duty of good faith limits unspecified contract price to what is commercially reasonable). Since the timeliness of payment is often essential to the value of insurance, the insured in *Lawton*, like the corporation in *Griswold* and the contractor in *Seaward*, could otherwise have been effectively deprived of consideration for his own prior performance (*i.e.*, in paying the premiums due).

*Lawton*, to be sure, spoke also of the insurer's improper motive to coerce the insured into accepting less than the true amount owed. But once the time for performance has arrived, it would seem that any motive for withholding payment would be improper; *e.g.*, withholding simply to enjoy continued use of the money would be wrong. *Accord Jarvis v. Prudential Ins. Co.*, 122 N.H. 648, 653–54, 448 A.2d 407, 410–11 (1982). If, then, any motive to withhold payment beyond the reasonable time is wrong, *Lawton* is best understood as a case in which good faith was held to require that discretion over the timing of payment be subjected to a test of commercial reasonableness.

To this revisitation of *Griswold*, *Seaward*, and *Lawton*, which form the foundation of our law on good faith performance, we should add a somewhat less extended review of three other cases addressed in the briefs, which are to the same effect. Each party has cited *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902 (1st Cir. 1987), resting on New Hampshire law for holding that the lessee under a contract for the hire of specified automobiles

for its business needs, but obligating it to pay only at a rate per mile of actual use, was bound in good faith to make reasonable efforts to use the lessor's cars in the conduct of the lessee's ordinary business, *id.* at 904. Absent such a construction, the contract would have obligated the lessor to make vehicles available to the lessee, but without any right to receive consideration in return except at the lessee's unfettered sufferance in choosing to drive the lessor's vehicles, instead of obtaining needed transportation some other way. The case reflects the law developed in the preceding performance cases in narrowing an otherwise unlimited discretion to deprive another party of reasonably expectable consideration.

The remaining two cases have been cited by Centronics as stating relevant New York law. In *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985), an employer was held to have violated good faith in firing an employee for the sake of taking advantage of a contract clause extinguishing the employee's right to accrued commissions upon discharge, *id.* at 112. Here, too, we see an otherwise unregulated right to discharge limited so as to preclude the employer from depriving his employee of contract consideration to which the employee had already become entitled by virtue of his own performance.

Similarly, in *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671 (2d Cir. 1983), *cert. denied*, 466 U.S. 938 (1984), a book publisher, whose contract with an author contained no restriction on its discretion to spend much or little in promoting the author's book, was held to be bound in good faith to make enough effort to give the book a reasonable chance of commercial success, *id.* at 679–80. Absent such a construction, the publisher would have been free to decline to publicize the book and so to deprive the author of virtually the entire value of the contract.

Despite the variety of their fact patterns, these cases illustrate a common rule: under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting. A claim for relief from a violation of the implied covenant of good faith contractual performance therefore potentially raises four questions:

1. Does the agreement ostensibly allow to or confer upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value? Contracts may be broken in a multitude of ways and theories of relief are correspondingly numerous, but the concept of good faith in performance addresses the particular problem raised by a promise subject to such a degree of discretion that its practical benefit could seemingly be withheld.

2. If the ostensible discretion is of that requisite scope, does competent evidence indicate that the parties intended by their agreement to make a legally enforceable contract? In many cases, such as *Lawton* and *Seaward*, this question will not pose a serious issue, and it surely would not call for any extended consideration in the case before us. *Griswold*, however, illustrates why the question must at least be recognized, for the very breadth of discretion necessary to predicate a claim of bad faith can also raise doubt about the parties' intent to be bound.

3. Assuming an intent to be bound, has the defendant's exercise of discretion exceeded the limits of reasonableness? The answer to this question depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations may be measured, and in furtherance of which community standards of honesty, decency and reasonableness can be applied.

4. Is the cause of the damage complained of the defendant's abuse of discretion, or does it result from events beyond the control of either party, against which the defendant has no obligation to protect the plaintiff? Although this question is cast in the language of causation, it may be seen simply as the other face of question three. Suffice it to say here that its point is to emphasize that the good faith requirement is not a fail-safe device barring a defendant from the fruits of every plaintiff's bad bargain, or empowering courts to rewrite an agreement even when a defendant's discretion is consistent with the agreement's legally contractual character.

Applying this analytical sequence to the instant case takes us no further than the first of the four questions, whether the agreement effectively confers such discretion on Genicom over the timing of

distributions from the escrow fund that, in the absence of some good faith limitation, Genicom could deny Centronics a substantial proportion of the contract's benefit. Was Genicom, that is, given authority to deprive Centronics indefinitely of a portion of the agreed consideration for the business assets previously transferred? The answer is obviously no. Unlike the contract in *Lawton*, for example, this one contains express and unequivocal provisions governing the timing of payment, which must occur no later than ten days after final resolution of the purchase price, presumably on conclusion of the mandatory arbitration. *See Lawton*, 118 N.H. at 612–13, 392 A.2d at 580. Genicom has no discretion to withhold approval for pay-out beyond that time, or to affect the timing of the arbitration itself. If, indeed, either party were dragging its heels in the conduct of the arbitration, it should go without saying that the dilatory conduct would be seen as a breach of contract, whether expressed in the language of bad faith or in traditional terms of the obligation to act within a reasonable time. *See* RE-STATEMENT, *supra* at § 205, comment *d*. In short, because contractual provisions mandating payment on conclusion of the valuation process determine the date on which Centronics will get its due, it is clear that what Centronics claims to be Genicom's discretion over the timing of distribution is in reality a power that each party may exercise, but only jointly with the other, to agree to remove some or all of the escrowed funds from the ambit of the otherwise mandatory pay-out provisions.

Although this discussion reflects the analytical structure of the prior good faith performance cases cited by Centronics and followed here, we should also note that the same result would obtain from applying an alternative analysis proposed by Professor Burton, referred to above, which Centronics has also urged us to employ. Burton's functional analysis of the obligation to observe good faith in discretionary contract performance applies objective criteria, *see* Burton, 94 HARV. L. REV. at 390–91, to identify the unstated economic opportunities intended to be bargained away by a promisor as a cost of performance, and it identifies bad faith as a promisor's discretionary action subjectively intended, *id.* at 386, 389, to recapture such an opportunity, thereby refusing to pay an expected performance cost, *id.* at 373. Centronics argues that its uncontradicted summary judgment affidavits establish that Genicom showed bad faith in Burton's sense, because its refusal to authorize distribution of the so-called undisputed amounts was an "attempt to recapture [the] degree of control concerning the amount of the final purchase price [which] it had agreed to place ... in

the arbitrator's hands ... and thereby unjustifiably attain funds to which it was not entitled."

Genicom, of course, denies the uncontradicted evidentiary force that Centronics claims for its affidavits. But even assuming, *arguendo*, that the affidavits are uncontradicted and tend to prove what Centronics asserts, there are two respects in which the facts would fail the Burton test of bad faith as an exercise of discretion meant to recapture an opportunity foregone at the creation of the contract.

It is significant, first, that Genicom's refusal to consent to the distribution from escrow neither recaptures nor gains Genicom anything. In and of itself, the refusal removes no issue from the contingencies of arbitration and gives Genicom no present or future right to the money it wishes to obtain. Genicom's behavior thus contrasts sharply with examples of bad faith given by Burton, in which the discretionary delay preserved the actual use of funds or other valuable resources to the party exercising the discretion. *See* Burton, 94 HARV. L. REV. at 394–402. The point is that only when the discretionary act recaptures an economic opportunity does the exercise of discretion pass from the realm of applying leverage for the sake of inducing further agreement into the sphere of bad faith, in which no agreement is necessary to realize the offending party's advantage.

The contrast is equally stark between the result of Genicom's decision and the beneficial results obtained by defendants in the cases Centronics specifically relies upon. In *Lawton*, for example, by refusing to pay the policy proceeds, the insurance company retained control of the funds, for whatever investment opportunity might be to its advantage. The company had the money and kept it. So too in *Wakefield v. Northern Telecom, Inc.*, where the employer kept the commission money, and in *Zilg v. Prentice-Hall, Inc.*, where the publisher retained the money it refused to spend on advertising the author's book. In each of these cases, the defendant's discretionary act of bad faith kept money in its pocket, with the attendant opportunities to use that money as it saw fit. On the contrary, by Genicom's refusal, standing alone, it neither retains nor obtains a penny of the money it wishes to receive.

A second and more fundamental flaw infects Centronics's reliance on the Burton analysis, however. It will be recalled that Burton's conception of bad faith in performance is the exercise of discretion for the purpose of recapturing opportunities foregone or bargained away at the time of contracting, with the identification of such foregone opportunities depending on objective analysis of

the parties' "[e]xpectations [as they] may be inferred from the express contract terms in light of the ordinary course of business and customary practice ...." Burton, 94 HARV. L. REV. at 389. Hence, if an objective basis exists to infer that the parties never bargained away the right of either of them to condition any distribution on completing the arbitration of any disputes, then Genicom can not be guilty of bad faith by so insisting, whatever its subjective motive may be. We infer that the opportunity for such insistence never was bargained away.

Although the contract documents do not concisely state there will be no interim distribution, the texts come very close to such a provision. We have previously quoted the language of the escrow agreement that "[i]n accordance with Section 2.07 of the Purchase Agreement," the escrow agent shall hold the fund until instructed by the buyer's and seller's counsel to make a distribution. Section 2.07 was also quoted above. Its topic heading is "Final Payment of Purchase Price," and it provides that final payment and settlement shall be made within ten days of the final determination of net book value and purchase price, which will presumably be at the close of arbitration. "Final Payment ..." is apparently so called to distinguish it from the "Payment to Sellers on Closing Date," required by § 2.03 of the agreement, since there is no other provision calling for any payment or distribution. The text thus supports the claim that the parties intended the escrow agent to leave the fund intact until the point of the final payment, if any, that would be due to Centronics ten days after the final price determination.

This reading is confirmed by an understanding of the evident business purposes to be served by such a restriction on pay-out. We explained above that the original escrow of $5,000,000 was to be increased by Genicom's deposit of an Adjustment Amount, which in effect was equal to the amount of Centronics's proposed revision of the final purchase price in excess of the preliminary purchase price. Although Centronics was obligated to follow accepted accounting procedures when it revised the balance sheet to calculate any adjustment, the revision was to be unaudited and Genicom had no control over the setting of this amount.

Genicom, however, was not left entirely subject to Centronics's natural temptation to state a higher, rather than a lower, Adjustment Amount. It is reasonable to suppose each party appreciated that the extent of disagreement and the resulting duration of arbitration would be roughly proportional to the size of the Adjustment Amount. If Centronics had to wait upon the

outcome of arbitration before it received any escrowed funds, then Genicom would be able to rely on Centronics's own self-interest to limit the probable length of arbitration by limiting the amount of the adjustment potentially subject to arbitration.

It is also reasonable to assume that neither party expected the other to emerge from arbitration with the whole escrow fund. Each therefore had reason to seek some mechanism for inducing the other side to promote speedy arbitration and the prompt distribution of escrowed money. Such a mechanism would be provided by a scheme conditioning any distribution on completing arbitration, since each would thus be induced to hasten the process for their common benefit.

■ The probability is, therefore, that each party expected the escrow to remain intact throughout arbitration, as the reason for Genicom's agreement that Centronics would have discretion to state the amount of the adjustment, and as the inducement to a prompt effectuation of their common object of obtaining whatever would be due to each from the fund so escrowed. Whether, therefore, we rely on the analysis underlying our own prior cases, or on the rule as espoused by Burton, we affirm the trial judge's conclusion that Centronics is seeking a revision of the contract, not the enforcement of good faith in its performance.

*Affirmed.*

All concurred.