Sunshine v. FDIC                    CV-93-170-B    12/02/94

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Sunshine Development, Inc.</u>

    v.                                    No. C-93-170-B

<u>Federal Deposit Insurance Corp.</u>


**<u>OPINION</u>**


First Service Bank for Savings advanced more than $24 million to Sunshine Development, Inc. between 1985 and 1988 to finance several of Sunshine's real estate developments. The bank lost confidence in Sunshine after a Federal Deposit Insurance Corporation ("FDIC") audit report criticized several of Sunshine's loans. This prompted the bank to order an appraisal of the loans' security. The appraiser concluded that the "as is" value of the security was substantially less than the amount Sunshine owed the bank. Subsequently, the bank obtained a $10 million ex parte attachment and refused to release it until Sunshine agreed to turn over 100% of the proceeds from any future real estate closings. Sunshine later filed for bankruptcy protection.

First Service sued Sunshine and its guarantors to recover on Sunshine's loans.  In a separate action, Sunshine sued First Service claiming that the bank caused it to fail by wrongly obtaining the attachment and imposing the 100% of closing proceeds requirement.  Following the bank's failure, the FDIC succeeded to First Service's interest in both actions which were later consolidated for trial in bankruptcy court.  By agreement, the claims were tried to a jury and the jury returned verdicts of $0 on the FDIC's claims and $2 million on Sunshine's claims.  The bankruptcy court vacated both verdicts and awarded judgment as a matter of law to the FDIC in the amount of $2,717,856.12.  It also determined that no reasonable jury could have awarded Sunshine anything on its claims.  Sunshine appeals from the bankruptcy court's order.

## I.   STANDARD OF REVIEW

A bankruptcy court decision on intermediate appeal to the district court is subject to the same standard of review that governs the appellate review of civil cases generally.  In re LaRoche, 969 F.2d 1299, 1301 (1st Cir. 1992).  Because Sunshine's appeal revolves around the legal sufficiency of the evidence, my review is plenary.  Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993).

The bankruptcy court was not entitled to reverse the jury's decisions "`unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment.'" Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994) (quoting PH Group Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir. 1993)). In other words, "[a] court is without authority to set aside a jury verdict and direct the entry of a contrary verdict unless the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Keisling v. Ser-Jobs For Progress, Inc., 19 F.3d 755, 759-60 (1st Cir. 1994) (citing Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993)).

"In determining whether this standard has been met, the court must examine the evidence in the light most favorable to the non-moving party; in addition, the non-moving party is entitled to `the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn.'" Id. at 760 (quoting Cochrane v. Quattrocchi, 949 F.2d 11, 12 n.1 (1st Cir. 1991), cert. denied, 112 S. Ct. 2965 (1992)). Moreover, the court must "`not consider the credibility

3

of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'" <u>Rolon-Alvarado</u>, 1 F.3d at 77 (quoting <u>Wagenmann v. Adams</u>, 829 F.2d 196, 200 (1st Cir. 1987)). Instead, it must "`take the facts as shown by the [nonmovant's] evidence and by at least such of [movant's] uncontradicted and unimpeached evidence as, under all circumstances, the jury virtually must have believed.'" <u>Wagenmann</u>, 829 F.2d at 200 (quoting <u>Karelitz v. Damson Oil Corp.</u>, 820 F.2d 529, 530 (1st Cir. 1982)).

With this standard in mind, I turn to the merits of Sunshine's arguments.

## II. <u>DISCUSSION</u>

A. <u>The FDIC's Claims</u>

In awarding the FDIC $2,717,856.12, the bankruptcy court noted that the only argument Sunshine and the guarantors offered in defense of the jury's verdict on the FDIC's claims was that the evidence was sufficient to permit the jury to conclude that Sunshine owed nothing on the loans because First Service had failed to properly apply certain of Sunshine's loan payments. The court evaluated this argument by identifying all of the disputed payments that the jury could reasonably have credited to

Sunshine, and subtracting the disputed payments from the total principal balance of the loans that the FDIC claimed were outstanding at the time of trial. The court then entered judgment for the FDIC for the amount remaining after crediting Sunshine with the disputed payments.[1]

Sunshine and its guarantors offer only two arguments on appeal challenging the court's determination. First, they argue that the FDIC's evidence of nonpayment was so unreliable that the jury was entitled to reject it and conclude that Sunshine had repaid all of the disputed loans. The bankruptcy court correctly rejected this argument because it is premised on the mistaken assumption that the FDIC must prove non-payment as an element of its suit on the notes and guarantees. Payment is an affirmative defense that the party claiming the defense must prove. Campo v. Maloney, 122 N.H. 162, 169, 442 A.2d 947, 1002 (1992); see also, Glenn v. Keedy, 248 Iowa 216, 221, 80 N.W.2d 509, 512 (1957); Vernon Ctr. State Bank v. Mangelsen, 166 Minn. 472, 478, 208 N.W. 186, 188 (1926); Tate v. Rouse, 247 Miss. 545, 547, 156 So. 2d

---

[1]The court checked its calculations by subtracting all payments Sunshine claimed that it made on the loans after July 20, 1988 from the outstanding principal amount of Sunshine's loans on that date. Using this method, the court determined that Sunshine owed the bank $2,773,069.44.

5

217, 218 (1963); <u>Baker Nat'l Bank v. Lestar</u>, 163 Mont. 45, 51, 453 P.2d 774, 777 (1969); 6A Ronald A. Anderson, Uniform Commercial Code § 3-601:17 (3d ed. 1993).

Since Sunshine and the guarantors have the burden of proof on this issue, they cannot support a jury verdict in their favor merely by pointing to deficiencies in the opposing party's evidence. <u>See, e.g.</u>, <u>Bose Corp. v. Consumers Union of United States, Inc.</u>, 466 U.S. 485, 512 (1984) ("when the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally, the discredited testimony is not considered a sufficient basis for deriving a contrary conclusion").

Sunshine and the guarantors also argue that the bankruptcy court failed to credit them with what they contend was a $1,016,000 payment that First Service erroneously applied to another loan that Sunshine had already repaid. In cases such as this, where a borrower with several outstanding loans asserts a payment defense, the borrower has "not only the burden of proving payment to the creditor, but also the burden of proving that such payment was made on the particular obligation in controversy." <u>Baker Nat'l Bank</u>, 153 Mont. at 51, 453 P.2d at 777; <u>see also</u> <u>Tate</u>, 247 Miss. at 547-48, 156 So.2d at 218.

6

Here, Sunshine elicited testimony from a former bank employee that the bank over-funded one of Sunshine's loans by $1,016,000 and then attempted to attack the testimony by suggesting that the bank's records did not substantiate the witness's claim that the loan had been over-funded. It then asked the jury to infer that if the loan had not been over-funded, Sunshine must have paid the bank $1,016,000 more than the face amount of that loan, and the bank must have disregarded Sunshine's instructions to apply the $1,016,000 to one of the disputed loans. Relying on this chain of inference, Sunshine and the guarantors argue that the evidence produced at trial was sufficient to permit a reasonable jury to reduce the FDIC's potential recovery by an additional $1,016,000. I reject this argument because it requires several leaps of faith that no reasonable jury could make.

While a jury might reasonably have concluded from the evidence that the bank's records reflecting the $1,016,000 over-funding should not be accorded any weight, there is no other affirmative evidence in the record establishing that Sunshine ever made the $1,016,000 payment. Thus, in order to accept Sunshine's argument, the jury would have to conclude both that the bank's records were incorrect in showing that the loan had

7

been over-funded <u>and</u> that the same records correctly reflected the $1,016,000 payment. Sunshine offered no evidence to support such an unlikely inference. Moreover, even if the evidence was sufficient to permit the jury to conclude that Sunshine had overpaid one of its loans, there is no evidence in the record to suggest that the overpayment occurred because the bank had disregarded Sunshine's instructions to apply the $1,016,000 payment to one of the disputed loans. In light of these deficiencies, Sunshine was not entitled to credit for the $1,016,000 payment.

B. <u>Sunshine's Claims</u>

The jury also returned a $2,000,000 general verdict in Sunshine's favor. Although Sunshine presented the jury with claims for breach of contract, breach of fiduciary duty, negligence, tortious interference with a contractual relationship and conversion, it confined its argument in defense of the jury's verdict to a claim that the bank breached its implied contractual duty of good faith and fair dealing by obtaining the attachment and demanding 100% of the proceeds from all closings.

The bankruptcy court concluded that Sunshine did not produce enough evidence to convince a reasonable jury that the bank had

8

acted unfairly or in bad faith by requiring Sunshine to turn over 100% of proceeds from all future closings.  Because the court concluded that Sunshine had not proved that it had suffered any damages as a result of the attachment, it did not also consider whether the evidence would support a verdict that the bank had obtained the attachment in bad faith.  I follow a somewhat different path from the one chosen by the bankruptcy court and begin by summarizing the law governing good faith and fair dealing claims in New Hampshire.

**1.  Good Faith and Fair Dealing Claims**

New Hampshire's version of the Uniform Commercial Code provides that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."  N.H. Rev. Stat. Ann. § 1-203 (1961).  The Code also recognizes that a contract term allowing a party to accelerate payment "when he deems himself insecure or words of similar import shall be construed to mean that he shall have the power to do so only if he in good faith believes that the prospect of payment or performance is impaired."  N.H. Rev. Stat. Ann. § 1-208 (1961).  The Code defines good faith as "honesty in fact in the conduct or transaction concerned."  N.H. Rev. Stat. Ann. § 1-201(19) (1961).  The New Hampshire Supreme Court has

9

determined that these provisions impose a duty of subjective good faith on the parties to a transaction governed by the Code. Balon v. Cadillac Automobile Co., 113 N.H. 108, 112, 303 A.2d 194, 196 (1973); see also Reid v. Key Bank of S. Maine, Inc., 821 F.2d 9, 14 (1st Cir. 1987) (interpreting Maine law).

New Hampshire also recognizes that the parties to any contract owe each other a common law duty of good faith and fair dealing. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139, 562 A.2d 187, 190 (1989). If an enforceable contract vests a party with discretion, New Hampshire law imposes on the party "an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting." Id. at 143. This is an objective duty of good faith because it requires that a party vested with discretion must exercise the discretion reasonably. See id.

Sunshine claims that the bank breached its duty of good faith and fair dealing by accelerating the loans, obtaining the attachment and imposing the 100% payment requirement. Since this claim is governed by both the statutory and the common law duties of good faith, the jury was entitled to find in Sunshine's favor if the bank acted either dishonestly or in a commercially unreasonable manner.

10

## 2. Application

The FDIC produced evidence at trial suggesting that the bank had appropriately invoked the acceleration clause in each note and obtained the attachment in good faith because: (1) Sunshine triggered each note's cross-default clause by failing to pay a substantial overdue balance on one of its loans; and (2) the bank reasonably relied on a clause in each note allowing it to declare the note in default "if any event shall happen which in the judgment of the holder would diminish holder's expectations [of] repayment of the note."[2]  Because Sunshine has the burden of proving that the bank obtained the attachment in bad faith, it cannot sustain the jury's verdict on this basis unless it produced sufficient evidence at trial to permit a reasonable jury to conclude either that the FDIC's explanations were a mere pretext concealing bad faith intentions or that the FDIC's conduct was commercially unreasonable.

### a.  the overdue balance on loan no. 1748

Sunshine's notes each contain a cross-default clause.  Thus, a default on any note entitled the bank to declare the other

_____

[2]Several of the notes contain a typographical error in the insecurity clause.  However, the error is inconsequential since Sunshine does not contend that it led to any misunderstanding.

11

notes in default and to accelerate all of the notes.  The bank
produced evidence at trial that it accelerated the notes and
obtained the attachment in part because Sunshine had an overdue
balance of $514,999.10 on loan no. 1748.  Sunshine disagrees, and
argues the bank records reflecting the overdue balance were
caused by an erroneous $500,000 debit the bank made to the loan
approximately a year before it obtained the attachment.  The only
evidence Sunshine points to in support of this argument is a
conclusory assertion by Ronald Belanger, one of the loan's
guarantors, and a bank record showing that the loan was debited
by $500,000 on July 7, 1987.  This evidence does not establish
that the debit was improper.[3]  Therefore, it does not undermine
the bank's contention that loan no. 1748 was in default.  Since
Sunshine offered no other evidence to counter the FDIC's
assertion that the loan was in default when the bank obtained the
attachment, the jury had no basis for concluding that the bank
acted either with dishonesty or unreasonably by declaring the
remaining loans to be in default, accelerating the loans and

---

[3]The same record suggests that the bank entered a $500,000
credit on the loan the same day the debit was entered.  Thus,
even if the records established that the debit was improperly
entered, the same records demonstrate that the bank promptly
corrected its error.

12

obtaining the attachment.

        b.  <u>the insecurity clauses</u>

The FDIC also presented evidence suggesting that the bank accelerated the loans and obtained the attachment in part because it deemed itself to be insecure. To support its claim, the FDIC offered evidence that it had the security for Sunshine's loans appraised in May 1988 and determined that the "as is" value of the security was substantially below the total amount of Sunshine's secured debt. It also produced an FDIC examination report classifying all of Sunshine's loans either as "substandard," "doubtful," or "loss." Finally, it produced evidence from a former bank official who testified that he had considered the appraisal and the FDIC report in concluding that the bank did not have adequate security for Sunshine's loans.

Sunshine identifies two pieces of evidence to counter the FDIC's claim. Citing the appraiser's report, it argues that the bank could not reasonably have deemed itself to be insecure because the report establishes that the retail value of the bank's security was greater than the amount due on the loans. I reject this argument because the record contains no evidence suggesting either that the bank had a practice of determining loan-to-value ratios by using the retail value of its security or

13

that the bank acted in a commercially unreasonable manner by not doing so. Without such evidence, no reasonable jury could conclude that the bank did not honestly and reasonably believe itself to be insecure simply because the retail value of its security may have exceeded the amount due on Sunshine's loans.

Sunshine's second piece of evidence is a report prepared by a former bank official several months after the bank obtained the attachment. In a summary section of the report, the bank official states:

> to date we have charged off $1,000,000 and have a remaining loss projection of $2,296,853 . . . . Because of the proven track record with Belanger financing the houses with his own funds, cross-collateralization of the loans, and a new appraisal on Hudson property that could add 1 mm in equity, I feel we will have no problem in justifying to the FDIC the elimination of a remaining loan loss reserve of $2,296,853 because of our existing collateral in place. I am very optimistic that we will work out of these loan [sic] and so is Belanger by 3/31/89, including recovery of the $1,000,000 charge off.

Sunshine contends that this is sufficient evidence to permit a reasonable jury to conclude that the bank did not reasonably deem itself to be insecure when it obtained the attachment. I disagree.

14

The report notes that even after the bank obtained the attachment, it was still predicting that it would suffer a loss of more than $2,000,000 on Sunshine's loans in addition to the $1,000,000 loss it had already incurred. While the report's author expresses optimism that the bank could avoid the projected loss by continuing to work with Sunshine, he bases this conclusion on several factors, including a "new" appraisal that the author claimed could increase the value of the bank's collateral by up to $1,000,000. Sunshine points to no evidence suggesting that the bank was aware of this new appraisal when it obtained the attachment. Thus, the report by itself could not convince a reasonable jury by a preponderance of the evidence that the bank did not honestly and reasonably deem itself to be insecure when it obtained the attachment.

In summary, the only conclusions that a reasonable jury could draw from the evidence with respect to Sunshine's claims are that when the bank obtained the attachment: (1) Sunshine was in default on loan no. 1748; and (2) the bank honestly and reasonably deemed itself to be insecure. Either ground would have justified the bank's decision to accelerate the loans and

15

obtain the attachment. Moreover, since the 100% of closing proceeds requirement was far less onerous than other remedies available to the bank once it lawfully accelerated Sunshine's loans, a reasonable jury could only conclude that the bank was also entitled to impose this requirement as a condition for releasing the attachment.[4] Accordingly, no reasonable jury could have found for Sunshine on its good faith and fair dealing claims.

### III. CONCLUSION

The judgment of the bankruptcy court is affirmed.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

December 2, 1994
cc: Steven Solomon, Esq.
    William Aivalikles, Esq.

_____

[4]Sunshine also defends the jury's verdict by arguing that a course of conduct had developed in its dealings with the bank that prevented the bank from demanding 100% of the closing proceeds. Even if Sunshine proved that such a course of dealing existed and its claim was not barred by D'Oench v. Duhme Co. v. FDIC, 315 U.S. 447 (1942) or its statutory counterpart, 12 U.S.C.A. § 1823(e) (West 1989), the bank would not be bound to follow the course of dealing once Sunshine defaulted and its conduct entitled the bank to accelerate the loans. Since I determine that a reasonable jury would have to conclude from the evidence that the bank was entitled to accelerate Sunshine's loans, I do not consider Sunshine's course of dealing claim.

Steven A. Bolton, Esq.
Clerk, US Bankruptcy Court-NH