Custom Info. Tech. v. Southern Living CV-97-359-JD  10/16/98

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Custom Information
Technologies, Inc.

    v.                             Civil No. 97-359-JD

Southern Living, Inc.
d/b/a Cooking Light Magazine


O R D E R


Custom Information Technologies, Inc. ("CIT") entered an agreement with Cooking Light Magazine, owned by Southern Living, Inc., to provide software diskettes of recipes that Cooking Light would distribute to subscribers of its magazine.  Disappointed with the royalties it received from Southern for its software products, CIT brought suit alleging breach of contract and breach of the covenant of good faith and fair dealing.  Southern moves for summary judgment on both counts, and CIT objects.


Background[1]

During the fall of 1993, Cooking Light Magazine managers invited representatives from CIT to make a presentation of a software product that CIT had suggested would complement the

---

[1]The factual summary is taken from the parties' fact statements, LR 7.2(b), and is provided for background only.

magazine by offering diskettes of featured recipes.  On December 15, 1993, Thomas Mamos, president of CIT, and Thomas Marshall, General Manager of Cooking Light, signed a contract that provided for CIT to produce recipe software, titled CookWare and CookPac, and for Cooking Light to distribute the software to its subscribers and to pay CIT royalties.  The CookWare software included both an initial library of 300 recipes and the program to run updates sent in subsequent CookPac diskettes that would correspond to the eight yearly issues of the magazine.  CookPac was available in two different editions:  a Consumer Edition that allowed downloading of fifteen recipes per magazine, and a Professional Edition that allowed downloading of all recipes in each magazine.

Under the terms of the agreement, decisions regarding the marketing, promotion, and means of sale of CookWare and CookPac were the exclusive right of Southern.  At the time of signing the agreement, Tom Marshall of Cooking Light told Tom Mamos of CIT that Southern intended to distribute the CookWare product without charge and to charge for the CookPac diskettes on an "on demand" or "continuity" basis allowing customers to return diskettes without charge.  As a result, customers had no obligation to purchase any particular number of diskettes.  CIT did not object to the giveaway or the "continuity" distribution system.

Southern sold CookPac diskettes in the Consumer Editions for $6.98 each and Professional Edition diskettes for $11.98 each. A customer began the program by ordering the CookWare diskette with the first installment diskette of CookPac from the designated edition. A full year of either edition consisted of eight CookPac diskettes. Customers would receive and pay for each diskette installment during the course of a full year unless they earlier discontinued their participation, in which case a discontinuing customer would not receive or pay for further diskettes. CIT sent CookPac diskettes in shipments that corresponded to monthly issues of <u>Cooking Light</u>, and Southern sent royalties based on each shipment of diskettes.

The provisions of the agreement pertaining to CookPac royalties are in Exhibit B of the agreement, titled "License Fees." Clause two of Exhibit B pertains to royalties on CookPac diskettes and provides that CIT was to receive enhanced royalties at 50% "of the revenues received by COOKING LIGHT for sales of Product reduced by the COOKWARE Royalty" for the first five thousand "copies of Product" sold. Thereafter, "COOKING LIGHT shall pay to CIT a Regular royalty of forty percent (40%) of the revenues received by COOKING LIGHT for sales of Product reduced by the COOKWARE Royalty." The royalties clause further provided:

The above specified Royalties are based on the following minimum pricing for COOKPAC Products:

1. COOKPAC Consumer Edition - Minimum Price = 39.00
2. COOKPAC Professional Edition - Minimum Price = 79.60

With the exception of Promotional copies of the COOKPAC Product, COOKING LIGHT shall not distribute COOKPAC Products for less than the above specified minimum prices. These minimum prices are based upon direct distribution of Products by COOKING LIGHT to Customer Accounts.

The third clause of Exhibit B, titled "Payment of Royalties Due," provides that Cooking Light (Southern) would pay royalties on a monthly basis upon receipt of CIT's invoice stating total numbers of CookPac Consumer Edition and Professional Edition products sold, the number shipped as promotional items, and the total amount of royalties due. Part A.2. of the clause provided the per-unit calculation for each CookPac product royalty, to be determined by dividing the expected royalty based on sales of diskettes for a full year by the number of magazines per year.

In the spring of 1994, Southern began an advertising campaign for CookWare and requested feedback from CIT. Tom Mamos of CIT responded with comments including suggestions that Southern offer customers the opportunity to prepay in a lump sum for a year's subscription to either edition, rather than the "record club style."

The parties' agreement provided for a one-year term with an

4

automatic extension of one year, absent termination notice by either party. The agreement continued for two years, and the parties began to negotiate for a third year. In a letter dated November 6, 1995, Tom Mamos wrote to Tom Marshall saying that CIT was losing money on the program as it was then structured because of losses due to discontinued customers. Mamos suggested changing the structure from "pay as you go" to a "magazine metaphor" meaning that for a lower price customers buy and prepay for a yearly subscription to program. The agreement was extended by the parties during negotiations until February 1996 when it was terminated by CIT because the parties were unable to reach agreement for future dealings.

## Discussion

Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Southern contends that it complied with all terms of the contract and that its actions have not breached the covenant of good faith and fair dealing. In response, CIT argues that the contract requires royalties based on different calculations

5

entitling CIT to additional royalty payments, or that the contract's royalty terms are at least ambiguous. Alternatively, CIT argues that if the royalty provisions were interpreted to permit Southern to shift the financial risk of losses due to discontinued customers to CIT, then Southern breached the covenant of good faith and fair dealing.

A.   Breach of Contract

The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a legal question to be made "'based on the meaning that would be attached to [the contract] by reasonable persons.'" Galloway v. Chicago-Soft, Ltd., 713 A.2d 982, 984 (N.H. 1998) (quoting Gamble v. University of New Hampshire, 136 N.H. 9, 13 (1992)). The contract is considered as a whole, and contract language is given its customary or ordinary meaning. Merrimack School Dist. v. National School Bus Serv., 140 N.H. 9, 11 (1995). Contract terms that permit differing reasonable interpretations are ambiguous requiring extrinsic evidence to determine the intent of the parties. Galloway, 713 A.2d at 984.

CIT disputes the amount of royalties paid on CookPac products arguing that under the terms of the contract, it is due additional royalties based on a full year of CookPac diskettes

6

for each customer whether or not customers continued the program for all eight installments. Thus, CIT contends that it is entitled to royalties for CookPac diskettes that were never delivered, sold, or paid for. Alternatively, CIT argues that if its view of the contract does not prevail, the contract is ambiguous requiring additional factual development of the royalty provisions.

Southern interprets the contract to provide for royalties only on a per unit basis for CookPac diskettes that CIT delivered and that were sold to customers. In addition to the language of the contract, Southern points to the parties' two-year course of dealing under the contract during which time CIT was paid, and accepted without objection, royalties on CookPac diskettes that were delivered and sold, but did not claim and was not paid royalties for the remainder of installments after a customer discontinued the program.

The contract terms pertaining to royalties are far from a model of clarity. The contract does not expressly address the question of royalties for diskettes after a customer discontinued the program, nor does it allocate the risk of loss for discontinuance. While common sense supports Southern's interpretation, the language might be stretched to cover CIT's interpretation as well. To resolve a question about the parties'

7

intentions and meaning of their agreement, "the court may properly consider their actions after the contract was executed." Auclair v. Bancroft, 121 N.H. 393, 395 (1981); see also Spectrum Enters., Inc. v. Helm Corp., 114 N.H. 773, 776 (1974). The parties' actions must be clear and unambiguous to indicate their mutual agreement. Guaraldi v. Trans-Lease Group, 136 N.H. 457, 460 (1992).

CIT does not dispute that it acted in conformity with Southern's interpretation of the royalty provisions without objection while their agreement was in force. Indeed, Tom Mamos's deposition testimony establishes that CIT did not protest the royalties it received or demand that Southern pay royalties on the balance of discontinued programs. CIT argues, however, that its silence on the issue does not indicate its intent to agree to royalties on only continuing programs. Instead, CIT alleges that it assumed that Southern's malfunctioning computer program was responsible for lost royalties.[2]

The record presented for summary judgment does not support CIT's position. If CIT's silence during the two-year life of the contract, while it received royalties based on only diskettes

---

[2]Although CIT cites deposition testimony that confirms the existence of a computer program malfunction, CIT includes no citation to the record to support its assertion that it believed the computer glitch was responsible for low royalties.

sent and sold, was not enough to indicate CIT's understanding of the parties' agreement, then Tom Mamos's efforts to negotiate a new contract confirm the reason for CIT's silence. In his letter of November 6, 1995, to "Tom and Judy" at <u>Cooking Light</u>, Mamos wrote:

> As I mentioned to Judy on the phone, we are losing money on the program <u>as it is currently structured</u>. The existing program has some inherent flaws that inhibit program growth and minimize profitability. For example . . .
>
> 1. The customer needs to make a decision to continue or not each time they receive a CookPac. Result – 20% of the customers do not renew each issue. . . .
> 2. Also, our numbers indicate that a customer stays in the program, on average, for five issues. At CIT, we break even at four. This is only if we have 100% renewal. <u>This, as I demonstrated above, is not happening</u>. . . .
>
> The changes suggested below could help us improve the program on all of these major concerns. I believe that these changes to the structure, marketing and distribution of the program will ensure a profitable product for both <u>Cooking Light</u> and CIT. . . .

(emphasis added). Mamos recommended that the program be changed from a "pay as you go" system to a "magazine metaphor" meaning that customers would buy yearly subscriptions, prepaid, for CookPac products guaranteeing CIT royalties on full year programs. The letter, therefore, unambiguously explains that CIT was not achieving sufficient royalties because the structure of the program limited revenue to CIT when customers discontinued

their participation, not because of a computer program malfunction at Cooking Light, as CIT now argues.

CIT's silence, in this case, demonstrates its understanding of the contract. Had CIT believed it was entitled to more, under the contract, it would have said so. "'There is no surer way to find out what the parties meant, than to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, then they are entitled to.'" Bogosian v. Fine, 99 N.H. 340, 342 (1955). Based on the circumstances shown by the record, CIT did not protest Southern's royalty payments because the payments were in accord with CIT's understanding of the parties' agreement.

To avoid summary judgment, CIT must "come forward with specific, provable facts which establish that there is a triable issue." Aponte Matos v. Toledo Davila, 135 F.3d 182, 186 (1st Cir. 1998) (quotation omitted). A factual dispute is "genuine" and requires trial only if there is "sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party." Id. CIT has not shown a triable issue pertaining to the contract's meaning. The parties' two-year course of dealings under the contract unambiguously demonstrates that Southern intended to pay and CIT intended to receive

10

royalties on only the CookPac diskettes that were delivered to Southern and sold to continuing customers. Since that is what happened, no breach occurred. Accordingly, as no factual issue remains to be resolved with respect to CIT's breach of contract claim, Southern is entitled to summary judgment.

B. Breach of the Covenant of Good Faith and Fair Dealing

CIT contends, in the alternative to its breach of contract claim, that Southern breached its implied duty of good faith and fair dealing by adopting a marketing plan that did not guaranty a minimum return to CIT. Specifically, CIT says that Southern's plan to give away CookWare diskettes and not to package CookPac diskettes in annual subscriptions permitted customers to leave the program before the cost of the CookWare product was recouped and impermissibly shifted financial risk to CIT.

"The implied covenant of good faith and fair dealing is an example of a common law application of public policy to contract law." Harper v. Healthsource New Hampshire, Inc., 140 N.H. 770, 775 (1996). Under New Hampshire law, several different doctrines of the implied good faith duty serve different functions. Great Lakes Aircraft Co., 135 N.H. at 293. Most pertinent to the circumstances in this case, and the version of the doctrine CIT relies upon, is reflected in the following quotation:

11

> under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (1989).

The implied good faith obligation operates to control a party's exercise of discretion in performance of a contract. As Tom Mamos explained in his deposition testimony, Tom Marshall told him before the contract was signed and, therefore, before performance under the contract became an issue that Southern intended to give away the CookWare diskettes and to offer CookPac diskettes in a continuity program. At that point, CIT was free to decline the deal or to continue negotiations to achieve more favorable terms. Instead, Mamos enthusiastically agreed with Marshall's plans, as he related in his deposition testimony quoting his own reaction when Marshall told him about the plan: "'Great, if you guys decide to give it away, then that's fine. We'll – ' [sic] I used the phrase – 'you'll sell millions of them,' meaning, if you give something away, that way obviously you're going to make – you'll do better."

When Southern implemented its marketing plans, as Marshall had disclosed to Mamos, it was merely performing as the parties

12

had agreed.  "[T]he good faith requirement is not a fail-safe device barring a defendant from the fruits of every plaintiff's bad bargain, or empowering courts to rewrite an agreement even when a defendant's discretion is consistent with the agreement's legally contractual character."  Centronics, 132 N.H. at 144. CIT agreed to proceed with Southern's program as described before either party signed the contract.  The cause of CIT's loss of expected royalties was that the program failed to perform as planned and customers choose to discontinue their participation in greater numbers than anticipated, not Southern's exercise of discretion in implementing the program.[3]  See id.

CIT nevertheless asserts that the contract guaranteed that it would receive minimum royalties and that Southern's discretionary marketing choice, allowing customers to discontinue and giving CookWare free of charge, frustrated CIT's reasonable expectations for royalties.  CIT's argument seems to merely revisit its breach of contract claim.  While the contract established minimum pricing for each edition of CookPac products

_____

[3]As Southern points out, both Southern and CIT stood to profit from success of the marketing plan.  To the extent customers chose to discontinue the program, Southern as well as CIT lost money.  Thus, Southern was not benefitting from a bad plaintiff's bargain, but instead was also a victim of a marketing plan, or a product, that did not work as well as either party had expected.

as a base for calculating CIT's royalties, it did not set minimum royalties. Nor did CIT ever demand its "expected" minimum royalties from Southern during the life of the contract.

In addition, CIT's explanation that Southern's program frustrated its expectations is contrary to the terms stated in the contract. CIT says that CookWare did not cost Southern anything because the $10.00 royalty paid to CIT for each CookWare diskette for the first 10,000 units was offset against royalties for CookPac diskette sales. Thus, CIT argues, Southern bore no production costs for CookWare and transferred the risk to CIT of failing to recoup its costs through sales of CookPac. By giving away CookWare, CIT argues, Southern reduced customers' incentive to continue with the CookPac program.

It is not clear why a free product would reduce customers' interest in buying subsequent CookPac products, and Mamos at least initially believed the "loss leader" approach would result in millions of sales. Even assuming that CIT's description of events were true, however, the applicable contract provisions do not appear to support CIT's version of the payment scheme. As to promotional copies of CookWare distributed by Cooking Light free of charge, the contract did not require Southern to pay the $10.00 royalty, but instead Southern was to pay CIT's manufacturing and shipping costs and those costs were not to be

14

set off against royalties on CookPac products.  While that may not have been the parties' actual conduct, CIT has not claimed that Southern breached its <u>contract</u> obligations with respect to CookWare royalties or payments, and the circumstances do not support a claim for breach of good faith obligations.

In summary, CIT has not demonstrated a triable factual question pertaining to Southern's implied good faith obligation. Southern is entitled to summary judgment on this claim.

<u>Conclusion</u>

For the foregoing reasons, Southern's motion for summary judgment (document no. 8) is granted.  The clerk of court is directed to enter judgment accordingly and to close the case.

SO ORDERED.


Joseph A. DiClerico, Jr.
District Judge

October 16, 1998

cc:  Frank P. Spinella Jr., Esquire
     William L. Chapman, Esquire

15