Byrd v. Quantum Health Resources      CV-95-432-SD 07/16/97

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


M. Adele Byrd

    v.                                    Civil No. 95-432-SD

Quantum Health Resources Corp., d/b/a
 Quantum Health Resources


**O R D E R**


Plaintiff Adele Byrd brings this civil action against defendant Quantum Health Resources Corporation, d/b/a Quantum Health Resources, claiming that (1) Quantum treated her unfavorably in the conditions of her employment and later terminated such employment on account of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; (2) Quantum breached certain express and implied terms of the employment contract between the parties; and (3) Quantum defamed her by publishing an unfavorable assessment of her job performance.


Background

Quantum is a national provider of home therapies and support services to long-term, chronically ill patients. In 1992, Quantum hired plaintiff Byrd as a North East Area Marketing Representative. Byrd's job was to solicit patient referrals from

health care providers in her assigned territory. Byrd's supervisor was Virginia Kraus. In December 1993 Kraus completed a "Performance Appraisal" of Byrd's work. The evaluation was favorable, lauding Byrd for "[c]learly understand[ing] purpose, objectives, practices and procedures of Quantum" and for "[r]ecogniz[ing] the importance of quality in providing a competitive edge."

In August 1993 David Hayes took over as Byrd's supervisor. In November 1993 Hayes informed Byrd that some of her assigned territory was being reassigned to Jayne Poirier, a newly hired marketing representative. The decision to reassign some of Byrd's territory to Poirier appears to have generated some ill will between Byrd and Hayes. To compensate her for the lost territory, Hayes promised to pay Byrd commissions on patient referrals from her old territory for a three-month period.

In January 1994 Hayes sent Byrd a memo informing her that she would be required to meet certain performance expectations or risk losing her position at Quantum. In March 1994 Hayes prepared a report for his supervisor concerning the marketing representatives for the northeast area. In discussing Byrd, the memo stated, "Adele Byrd: Behind in paperwork; attitude needs improvement; will make decision on continued employment with QHR by 3/21/94." Through administrative error, the memo was mailed

to all of Byrd's co-workers.  At the end of March 1994 Hayes terminated Byrd.


Discussion

Title VII

Plaintiff brings her claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), claiming she was the subject of unlawful sex discrimination.  Title VII prohibits discrimination in employment "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Her Title VII claim can be separated into two parts.  First, she claims Quantum treated her unfavorably with respect to the conditions and terms of her employment on account of her gender.  Second, she claims Quantum terminated her employment because she is a woman.

Byrd's claim that Quantum unlawfully discriminated against her with regard to the terms of employment is clearly without merit.  Byrd claims that her supervisor Hayes and one of the other female North East Area Marketing Representatives, Jane Poirier, were having a sexual relationship, and for that reason Hayes treated Poirier more favorably than Byrd in regard to the

3

conditions and terms of employment.  Specifically, Byrd alleges that Hayes reassigned some of Byrd's more lucrative sales territory to Poirier in return for her amorous affections.  Even if these factual allegations are true, Byrd has not set forth a cognizable claim for sex discrimination.  Despite some contrary authority, see King v. Palmer, 778 F.2d 878 (D.C. Cir. 1985) (implicitly recognizing Title VII action premised on voluntary sexual relationship), this court believes that Title VII's prohibition against sex discrimination only proscribes distinctions based on gender, not on sexual affiliation. DeCintio v. Westchester County Medical, 807 F.2d 304, 306-07 (2d Cir. 1986).  Generally, Title VII prohibits discrimination based on immutable characteristics such as "race, color, religion, sex [and] national origin."  Classifications defined by immutable characteristics are invidious and unjust because they deprive a person of entitlements and opportunities on the basis of a characteristic the person cannot change.  Such classifications result from power exercised by a dominant group for no other reason than the perpetuation of hierarchy and oppression.  Gender is a highly visible immutable characteristic that has historically formed the basis for illegitimate discrimination. Frontiero v. Richardson, 411 U.S. 677 (1973).  Thus, Title VII was intended to "strike at the entire spectrum of disparate

4

treatment of men and women." Sprogis v. United Air Lines, 444 F.2d 1194, 1198 (7th Cir.), cert. denied, 404 U.S. 991 (1971). In contrast, workplace favoritism for the employer's sexual partner disadvantages both males and females who are not sexually involved with the employer. Membership in the disadvantaged group is defined by voluntary association rather than an immutable characteristic. Title VII was not intended to dismantle a system of classifications premised on voluntary sexual associations. Hayes's preferential treatment of his paramour, Poirier, discriminated against Byrd based on her sexual affiliation rather than her gender, and is therefore not actionable under Title VII.

Byrd's second Title VII claim, that Quantum terminated her for gender-based reasons, is also meritless. The central point of contention between the parties is whether Quantum terminated Byrd for discriminatory reasons based on her gender or, rather, for permissible nondiscriminatory reasons. Quantum claims that Byrd was terminated for poor performance, and offers evidence that she failed Quantum's performance expectations of its marketing representatives. Quantum's stated primary objective for its marketing representatives was obtaining patient referrals. In 1993, Quantum set a goal for its marketing representatives to obtain 30 referrals in a year. Byrd obtained

5

only 16 referrals in 1993, placing her at 33rd in rank out of 42 other Quantum marketing representatives. At the end of 1993 Hayes reviewed the performance of the North East Area Marketing Representatives and, of them, Byrd had the lowest number of referrals. In mid-January 1994 Hayes provided Byrd with a written memorandum regarding the level of performance expected of her. The letter provided:

> Your efforts in developing your assigned territory are commendable but have not generated significant referrals to date. In 1993 your Chronicare referrals totaled 16 patients against a plan of 30 Chronicare patients for the 12 month period. For 1994, the commission plan has even higher expectations and requires >40 Chronicare patients for the year.
>
> . . . .
>
> During the first two months of this year, you will be required to produce no less than 7 patient referrals which must be cleared for insurance and shipped. This number is based on an expected of >40 new chronic patient gains in 1994 to qualify for annuity payment.

Defendant's Memorandum in Opposition to Motion for Summary Judgment at 7 (quoting Byrd Deposition, Exhibit 11). In addition, the letter requested Byrd to submit to Hayes a written improvement plan detailing long-range goals and weekly agendas. The letter ended, "failure to improve overall patient gains and meet the performance guidelines specified above will result in disciplinary action and/or termination." Id.

6

Byrd failed to either obtain the required seven referrals or submit the written improvement plan.  In a monthly sales report prepared by Hayes, he stated that Byrd's performance provided grounds to question her continued employment with Quantum.  The report read:

> II.  Personnel Issues
>
>> A).  Exemplary Performance: Kay Barry & Susan Martin - 6 new Chronicare referrals.
>>
>> Problems: Adelle (sic) Byrd - 60 day program ends 3/15/94 - has five new referrals 1994 needs two more shipped by 3/15/94; Behind in paperwork; attitude needs improvement; will made a decision on continued employment with QHR by 3/21/94.

Defendant's Memo at 8 (quoting Byrd Deposition, Exhibit 13).  When Byrd was terminated, Hayes provided her written notice of the grounds or reasons for her termination, citing her failure to obtain the required seven referrals:

> Adele, I have reviewed your progress to date against the performance program which was documented in my memo to you dated January 13, 1994 and have determined that you have not successfully met the minimum criteria established for your continued employment with Quantum.
>
> Please recall you were to have achieved a minimum of seven (7) Chronicare™ referrals (cleared and shipped) during the first two months of '94, to date you have five (5).  In addition, you were to have completed a detailed business plan for your sales area with weekly and monthly plans to achieve this annual plan.  These plans have not been completed adequately.  Both of these

7

> objectives were critical elements of the
> performance program and your results, to date, are
> unsatisfactory.
>
> Therefore, your employment will be terminated
> effective 3/23/94.

Defendant's Memorandum at 9 (quoting Byrd Deposition, Exhibit 14).

This evidence substantiates Quantum's claim that the reason for terminating Byrd's employment was poor performance rather than the fact of her gender. As evidence that poor performance was not the reason for her termination, Byrd offers a favorable employee performance appraisal written by her previous supervisor, Virginia Kraus, in December 1993, three months prior to her termination. In evaluating the significance of this evidence, it must be remembered that the primary focus remains on lawfulness of the defendant's subjective motivation rather than the objective accuracy of the defendant's judgments and evaluations. Menard v. First Sec. Services Corp., 848 F.2d 281, 287 (1st Cir. 1988) (plaintiff's "proffered evidence does little but dispute the objective correctness of [defendant's] decision" to terminate plaintiff). There is no discrimination if Hayes's subjective motivation for terminating Byrd was poor performance, even if his unfavorable evaluation of her performance was objectively erroneous or unfair. Kraus's favorable evaluation of Byrd's performance merely indicates that Hayes may have been

8

objectively harsh or unfair in assessing Byrd's work performance. Kraus's evaluation, however, provides no insight into Hayes's subjective state of mind and motive for terminating Byrd. In sum, a favorable evaluation of Byrd's performance completed four months prior to her termination by a former supervisor cast no light on the reasons why Hayes terminated Byrd.

Next, plaintiff offers a cryptic handwritten office memo that insinuates Hayes was asserting poor performance as a pretext to firing Byrd for other reasons. The memo reads:

> 12-30-93 Conversation with David Hayes re Adele Byrd - possible hostile suit against QHR - improper handling of her performance. She has had surgery for carpal tunnel syndrome - has not ret'd voice mails left by V. Kraus - advise she call [at] home today - got recorder - I faxed Firemen's the 1st report & asked for status - told Kraus to fedex letter to Byrd - Hayes seems very concerned & would like her termed for poor performance.

Plaintiff's Objection to Motion for Summary Judgment and Memorandum of Law in Support Thereof, Exhibit B. According to Byrd, this memo indicates that Quantum's asserted reasons for her termination are a pretext.

The First Circuit has made clear that a plaintiff cannot necessarily meet the burden of showing discrimination solely by relying on proof that the defendant's proffered nondiscriminatory reasons for the adverse action are pretextual. Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994). The plaintiff

9

has the burden of proving that the defendant's true motivation underneath the pretext was discriminatory. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993). Under some circumstances, rejection of the defendant's proffered reason as pretextual may give rise to an inference that the true motivation was discriminatory. Id. However, this is not such a case because, while the office memo may indicate that poor performance was a pretext, there is no indication that unlawful discriminatory animus lurked beneath the pretext. Read in a light most favorable to plaintiff, the memo may suggest that Hayes wanted Byrd terminated under the pretext of poor performance. But the memo suggests that the true reason was Hayes's concern about a "possible hostile suit against [Quantum]," rather than Byrd's gender.

In sum, there is not a shred of evidence supporting Byrd's claim that Quantum terminated her because of her gender. Quantum has produced competent evidence that Byrd was terminated for the permissible, nondiscriminatory reason of poor performance. In addition, Quantum replaced Byrd with another woman. Byrd is left with little more than allegations that she is in a protected class and was terminated from employment. This is insufficient to survive a motion for summary judgment.

Breach of Contract

Next, Byrd claims that Quantum terminated her in violation of the covenant of good faith and fair dealing that inheres in all contracts. Byrd alleges that Quantum terminated her in bad faith in order to deprive her of commissions to which she otherwise would have been entitled. Quantum's commission policy states that "[c]ommissions . . . will only be paid to individuals employed at the time of disbursement." Defendant's Memo, Exhibit 1, "Offer Description". Byrd claims Quantum terminated her five days prior to the date on which commissions were to be disbursed in order to avoid any contractual obligation to pay her commissions.

The "implied covenant of good faith and fair dealing is not a catch-all cause of action aimed at eradicating all taint of the unethical from contract dealing." Carriage Hill Health Care v. Hayden, No. 96-101-SD, slip op. at 6 (D.N.H. Apr. 30, 1997). Rather, the covenant arises in response to "the particular problem raised by a promise subject to such a degree of discretion that its practical benefit could seemingly be withheld." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 140, 562 A.2d 187, 191 (1989). Justice Souter, writing for the New Hampshire Supreme Court, defined the scope of the covenant as follows:

11

> [U]nder an agreement that appears by word or
> silence to invest one party with a degree of
> discretion in performance sufficient to deprive
> another party of a substantial proportion of the
> agreement's value, the parties' intent to be bound
> by an enforceable contract raises an implied
> obligation of good faith to observe reasonable
> limits in exercising that discretion, consistent
> with the parties' purpose or purposes in
> contracting.

Id. at 143, 562 A.2d at 193.

Here, Quantum's promise to pay commissions is subject to their unfettered discretion under the employment contract to terminate employees at any time. Under Quantum's compensation policy, commissions are not payable to employees who are terminated before the date of commission disbursement, and under the employment contract, Quantum retains the discretion to terminate employees "at any time." Defendant's Memorandum, Exhibit 1, "Offer Description." Quantum may avoid paying commissions by exercising its discretion to terminate an employee before commissions are to be disbursed. This scheme renders Quantum's promise to pay commissions entirely illusory, and a faithful employee may be denied the fruits of his labor by an abusive exercise of Quantum's discretion to terminate employees at any time. This is clearly, in the words of Justice Souter, "a promise subject to such a degree of discretion that its practical benefit could seemingly be withheld." Id. at 140, 562 A.2d at 121. For that reason, Quantum's discretion to terminate "at any

12

time" is circumscribed by the covenant of good faith, imposing an obligation to observe reasonable limits in exercising that discretion. It is a question for the jury whether Quantum exceeded reasonable limits in terminating Byrd five days before her commissions were to be disbursed.

Next, Byrd claims that Quantum breached its promise to pay her commissions for a ninety-day period for referrals from her old territory that was reassigned to Poirier. At a November 1993 meeting with Hayes and Kraus, Byrd objected to the reassignment of a portion of her sales territory to Poirier. In answer to her objection, Hayes promised that Quantum would pay her commissions for referrals from her old territory for a ninety-day period. At that time, Byrd understood that the ninety-day period would begin in January when the reassignment became effective. At the end of November, Hayes wrote Byrd a memo regarding the reassignment of her territory which explained that the ninety-day period would begin in December. Quantum paid Byrd commissions for a ninety-day period beginning December 1 and ending in February. However, Byrd claims the ninety-day period was to begin January 1 and end in March.

Quantum argues that Hayes's November memo informing Byrd that the period would begin in December conclusively resolves the issue, and Byrd's understanding that the period would begin in

13

January is "wishful thinking," with no significance in interpreting the contract between the parties. However, the contract between the parties was formed at the November meeting when Hayes orally promised to pay Byrd's commissions for a ninety-day period. At that time, the terms of the contract were ambiguous with regard to when the ninety-day period would begin. Hayes's subsequent memo merely expresses his subjective understanding, or "wishful thinking," that the ninety-day period would begin in December. Hayes's subjective understanding of the ambiguous contract term is no more controlling in interpretation than Byrd's contrary subjective understanding. In fact, under the objective theory of contracts, which is controlling in New Hampshire, Echo Consulting Services v. North Conway Bank, 140 N.H. 566, 569, 669 A.2d 227, 230 (1995), neither party's subjective understanding of an ambiguous contract term is entitled to significant weight. Rather, "the standard is the meaning that the party making the manifestation should reasonably expect the other party to give it--the standard of reasonable expectation." CALAMARI AND PERILLO, CONTRACTS § 3-10, at 118 (2d ed. 1977). When Hayes told Byrd in the November meeting that Quantum would pay her commissions for a ninety-day period, he should have reasonably expected Byrd would understand the ninety-day period to cover January to March. Both parties understood that the

14

ninety days of commissions was additional compensation to Byrd for her loss of territory. Since the reassignment of territory from Byrd to Poirier became effective in January, a promise to pay commissions for December referrals would not provide Byrd with additional compensation because she would be entitled to December commissions in any event. Rather, a reasonable person who knew that the promise was intended to provide Byrd with additional compensation would understand the ninety-day period to begin in January when the reassignment of territory became effective.

In sum, Byrd has made sufficient showing that Quantum breached the contract between the parties.

Defamation

Next, Byrd claims that Hayes defamed her by publishing an office memorandum to all Quantum's North East Area Marketing Representatives that stated, "Adele Byrd: Behind in paperwork; attitude needs improvement; will make decision on continued employment with QHR by 3/21/94." Defendant's Memo, supra, at 8.

The RESTATEMENT defines defamation as "(a) false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either

15

actionability ability of the statement irrespective of special harm or the existence if special harm caused by the publication." Defendant's Memorandum at 21-22 (citing RESTATEMENT (SECOND) OF TORTS § 558 (1977)).

Quantum claims that the statement consists of protected opinion, as opposed to defamatory facts. In Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the Supreme Court said "[u]nder the First Amendment there is no such thing as a false idea," id. at 339, precluding a finding that a statement of opinion is defamatory. However, the RESTATEMENT notes that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT, supra, § 566, at 170. A statement of discharge from employment generally implies no more than an opinion or a subjective evaluation of the discharged employee. Davis v. Ross, 754 F.2d 80, 84 (1985). However, the publication of discharge may contain, by implication, an underlying objective evaluation of the employee, and thus may be considered defamatory under section 566 of the RESTATEMENT. Id.

Hayes's memo announcing an intent to consider discharging Byrd is not purely opinion, but contains, both expressly and by implication, underlying objective evaluations as bases for the

16

opinions expressed. First, the memo expressly states that one basis for terminating Byrd is that she is "behind in her paperwork," which is clearly an objective evaluation of her performance. Second, the statement that her "attitude needs improvement" implies the fact that she has displayed a poor attitude in the performance of her duties as a Quantum employee. Clearly, if Hayes told one of Byrd's prospective employers that Byrd's "attitude needs improvement," that employer would understand the statement to imply an objective evaluation of her job performance at Quantum. Thus, Hayes's memo is not protected opinion.

Quantum next argues that the statements of fact in the memo are true and, for that reason, cannot be defamatory. Since truth is a defense to defamation, Quantum bears the burden of proof on the issue. Quantum argues that the statement in the memo, "will make a decision on continued employment with QHR by 3/21/94," is demonstratively true because Hayes did in fact terminate Byrd by that date. This argument misses the point. When an opinion is held to be defamatory because it implies an underlying objective evaluation, truth value must attach to the objective evaluation, not to the opinion. The issue here is the veracity of Hayes's objective evaluations concerning Byrd's poor attitude and neglect of her paperwork. There remains a disputed issue of fact as to

17

whether these evaluations are accurate. Thus, even though Hayes may in fact have intended to discharge Byrd, Quantum has not met its burden of proving that Hayes's defamatory statements were true.

Next, Quantum argues that there was no publication of the memo. The RESTATEMENT states, "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." RESTATEMENT, supra, at § 577. Quantum claims that communication of the memo to all the North East Area Marketing Representatives was neither intentional nor negligent. According to Quantum, Hayes intended the memo to be mailed only to his immediate supervisor, but his assistant mistakenly addressed and mailed the memo to all the marketing representatives. Quantum thereby concedes that communication to the marketing representatives was caused by an administrative mistake of its employees. Thus there is no failure of proof of the acts said to constitute negligence, as would be the case, for instance, if no one was sure how the memo got mailed to all the marketing representatives. Rather, Quantum argues that mistaken dissemination of the memo was not negligent because it was "inadvertent and accidental." The court finds this an unusual argument, since it is hornbook tort law that inadvertent and accidental conduct may constitute negligence. The question is

18

whether the accident, mistake, inadvertence (or whatever else we may call it) was unreasonable and negligent.

Defendant's remaining argument on this issue consists of the assertion that this case is "on all fours with Morrow v. Morrow, Inc., 911 P.2d 964, 967-68 (Or. App. 1996)," in which the Oregon Supreme Court held that, as a matter of law, it was not negligent for an employee to save a defamatory computer-generated memo to a public disk drive accessible to all the coworkers. With all due respect to the Morrow court, this court cannot concur in the conclusion that, as a matter of law, saving a defamatory memo to a public disk drive was a reasonable mistake. But, even accepting that conclusion as accurate, the case at hand is distinguishable from Morrow. In Morrow, the defendant's mistake related to the operation of his computer, and computers are complex technology, whose proper operation often eludes even the most technically skilled. In this case, however, Hayes or his assistant cannot rely on the complexities of technology to excuse their conduct. Addressing a memo to the intended recipient and to no one else is a relatively simple task, especially in light of the sensitive nature of the memo's subject matter. Mistaken execution of this simple task is farther outside the bounds of the reasonable than the computer mistake made by the defendant in Morrow. On these grounds, the case at hand is distinguishable

19

from <u>Morrow</u>.

There remains a disputed issue of fact as to whether mistaken communication of the defamatory memo to the marketing representatives was unreasonable and negligent.

<u>Wrongful Termination</u>

Lastly, plaintiff claims she was terminated because "she did not conform her mode of dress to a more sexually suggestive style and because she did not have a sexual relationship with Hayes. Complaint at 14. Since plaintiff has offered no evidence to substantiate these allegations, this claim cannot survive summary judgment.

<u>Conclusion</u>

For the reasons outlined above, Quantum's motion for summary judgment (document 13) is granted as to Counts I, IV, V, and VI. Summary judgment is denied as to Counts II and III.

Byrd's motion to extend discovery (document 21) is granted for a two-week period to commence on the date of this order. Discovery is limited to ascertaining the identity of Hayes's administrative assistant who allegedly mailed the defamatory memo to Byrd's coworkers.

Byrd's motion to extend time to file a reply memorandum

(document 22) is denied, the court notes that the option of a motion to reconsider is available to Byrd, and she may advance any arguments therein that she would have advanced in a reply memo.

**SO ORDERED.**

_____
Shane Devine, Senior Judge
United States District Court

July 16, 1997

cc:   Marian Sagona Lynch, Esq.
      Edward A. Haffer, Esq.
      Mark J. Sifferien, Esq.

21