Daly v. University of N.H.          CV-00-064-M   09/19/01
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Cheryl J. Daly,
     Plaintiff

     v.                              Civil No. 00-64-M
                                     Opinion No. 2001 DNH 170
The University of New Hampshire,
     Defendant


                        O R D E R


     Cheryl J. Daly has sued the University of New Hampshire

("UNH") in two counts, alleging wrongful discharge and breach of

contract.  This diversity action arises from UNH's discharge of

Daly from her position as Director of its Office of Multicultural

Student Affairs ("OMSA").  Before the court is UNH's Motion for

Summary Judgment.  Daly objects.  For the reasons stated below,

UNH's Motion for Summary Judgment is granted.


                      **Standard of Review**

     Summary judgment is appropriate when the record reveals "no

genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)). "The non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "construe the record and all reasonable inferences from it in favor of the nonmovant (i.e., the party opposing the summary judgment motion)." Perez, 247 F.3d at 310 (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

## Factual Background

Viewed in the light most favorable to Daly, the relevant facts of this case are as follows. On July 1, 1994, UNH hired Daly to serve as Director of its Office of Multicultural Student Affairs. Daly was initially supervised by Daniel DiBiasio, Vice President of Student Affairs. (Moore Aff. ¶ 3.) Daly's position was classified as a "status" appointment, as opposed to a "non-status" appointment (Butler Aff. ¶ 5.), which entitled her to a continued expectation of employment; she could be terminated only for specific acts, such as poor performance or insubordination, and only if UNH followed a specified set of procedures. (Butler Aff. ¶¶ 3-5.) At the time of her hiring, Daly was subject to a standard six-month probationary period. That probationary period was twice extended, by three months each time, giving her a total probationary period of one year. (Moore Aff. ¶ 4 and Exs. 1, 3.) In extending Daly's probation, DiBiasio cited, among other things, her "antagonistic and confrontational" interactions with students and staff members and an incident of "confrontational and unprofessional" behavior toward a faculty member at the

3

University of Rhode Island.  (Moore Aff. ¶ 4 and Ex. 1 at 2.)  On April 6, 1995, early in the second three-month probation extension, and in response to a grievance filed against Daly by her secretary, DiBiasio concluded that "the work environment in the Office of Multicultural Student Affairs is dysfunctional" (Moore Aff., Ex. 2), placed the greater share of the responsibility for the office's dysfunction on Daly, and assigned the Director of Student Life to work two days a week in the OMSA office, to resolve problems between Daly and her secretary. (Moore Aff., Ex. 2.)  In an annual performance evaluation dated June 22, 1995, DiBiasio noted Daly's success in attracting students to the OMSA, but also criticized "the harsh manner in which [Daly had] treated peers and other staff [which had] been noted by several individuals who have complained about [her] combative and, at times, hostile attitude."  (Moore Aff., Ex. 4 at 1.)

In September 1995, approximately two months after the expiration of Daly's twelve-month extended probation, Dr. Lelia

Moore replaced DiBiasio as Vice President of Student Affairs and, as a result, became Daly's supervisor. (Moore Aff. ¶¶ 1-3.) Between June 1995 and December 1998, Daly was involved in confrontations with: (1) staff members of the Memorial Union and Student Activities Office, in June 1995 (Moore Aff., Ex. 5); (2) the campus police, in August and October 1997 (Moore Aff., Ex. 7); (3) employees of SPCT, in January 1998 (Moore Aff., Ex. 8); (4) a member of the Student Senate, in April 1998 (Moore Aff., Ex. 10); and (5) two employees of Taylor Rental, in November 1998 (Moore Aff., Ex. 12). The third of these incidents resulted in letters of apology from Dr. Moore and Daly to the manager of SPCT (Moore Aff., Ex. 9) while the fifth resulted in a letter of apology from the President of UNH to a student who worked at Taylor Rental (Moore Aff., Ex. 12) and an official written warning in which Dr. Moore directed Daly to curtail her "hostile, threatening and aggressive behavior" (Moore Aff., Ex. 16 at 1). Despite these various incidents, Dr. Moore gave Daly strongly positive performance evaluations on June 4, 1997 (Pl.'s Obj. to Def.'s Mot. Summ. J., Ex. 1) and July 22, 1998 (Moore. Aff., Ex.

5

11).  The second of these two evaluations, however, was not uniformly positive, and included several references to Daly's difficulties in "dealing with conflicts" and expressing "differing points of view without deprecating others."  (Moore Aff., Ex. 11 at 1.)

In April or May of 1998, Daly had a conversation with Deborah Hamilton, who had asked Daly about the possibility of working in the OMSA as a graduate assistant.  (Daly Dep. at 174.) At the time of this conversation, Hamilton was a UNH graduate student and was also Dr. Moore's domestic partner.  (Daly Dep. at 170, 173.)  Dr. Moore shared a home with Hamilton (Daly Aff. ¶ 3) and on at least one occasion, Dr. Moore and Hamilton sent out Christmas cards together (Daly Dep. at 168-69).

Daly did not follow up on Hamilton's initial inquiry about employment at the OMSA.  (Daly Dep. at 176.)  In August 1998, Hamilton sent Daly an e-mail expressing, for a second time, her interest in a position in the OMSA.  (Daly Aff. ¶ 2; Daly Dep. at

175.)  Daly followed up by calling Hamilton at the home she shared with Dr. Moore.  (Daly Aff. ¶ 3; Daly Dep. 176-77.)  After discussing various scheduling matters, Daly stated that she and Hamilton could work out the details of placing Hamilton in a position in the OMSA, but also indicated that she needed to discuss the matter with Dr. Moore.  (Daly Aff. ¶ 4; Daly Dep. at 177.)

When Daly raised the issue of hiring Hamilton with Dr. Moore, Moore said that it would be "fine" for Daly to hire Hamilton (Daly Dep. at 183) and that Hamilton would be a good worker (Daly Dep. at 178).  Daly claims, but Dr. Moore denies, that Moore also thanked Daly for hiring Hamilton by saying "Bud, thanks for taking her out of my hair."  (Daly Dep. at 178; Daly Aff. ¶ 4.)  However, Dr. Moore neither asked nor directed Daly to hire Hamilton.  (Daly Dep. at 184-85.)

By letter dated December 1, 1998, Hamilton resigned from her position in the OMSA.  (Moore Aff., Ex. 13 at 1.)  By letter

7

dated December 2, another student worker also resigned, citing Daly's failure "to act in an ethical and professional manner." (Moore Aff., Ex. 13 at 2.) Shortly thereafter, by letter dated December 13, 1998, Associate Professor John Ernest, who along with Daly co-chaired the President's Commission on the Status of People of Color, resigned from that position, stating that he could "no longer work with Cheryl Daly – whose approach to this and other work is, in my view, almost always unstructured, sometimes unprincipled, and usually autocratic." (Moore Aff., Ex. 14.)

Between December 16, 1998 and March 1999, Dr. Moore received a number of complaints about Daly's behavior from students. (Moore Aff. ¶ 16 and Ex. 15.) She also initiated a financial audit of the OMSA, based upon concerns about possible overpayment of student workers. (Moore Aff. ¶¶ 17-18.) Among other things, the audit disclosed the possibility that a number of students – including Hamilton – had received double payments for hours they had worked at the OMSA. (Moore Aff. ¶ 17.) Daly first learned

8

that double payments had, in fact, been made to Hamilton in late February 1999, from Moore's financial officer, Patsy Stuart. (Daly Dep. at 133, 154; Daly Aff ¶ 17.)  On February 22, 1999, another student worker resigned from a position in the OMSA, stating: "I have also found the work environment within your office to be quite unhealthy and disrespectful."  (Moore Aff. ¶ 19 and Ex. 17.)

Based upon her concerns over the negative reports she had received about Daly's behavior, Dr. Moore met with Daly on March 10, 1999.  (Daly Aff. ¶ 21; Moore Aff. ¶ 20.)  On March 12, 1999, Dr. Moore followed up by sending Daly an e-mail restating the list of concerns they had discussed on March 10.  (Moore Aff. ¶ 20 and Ex. 18.)  On March 31, 1999, Dr. Moore conducted Daly's annual performance evaluation, during which she provided Daly with a six-page written "performance appraisal" that described in detail much of the information about Daly's behavior that Dr. Moore had collected over the previous three months.  (Daly Aff. ¶ 23; Moore Aff. ¶ 21 and Ex. 19.)  In that performance appraisal,

9

Dr. Moore placed Daly on a four-month post-initial probation and directed her to "develop and review with [Dr. Moore] a plan to achieve these two goals of correcting the unacceptable behaviors and regaining the respect of students, staff and faculty." (Daly Aff. ¶ 24; Moore Aff. ¶ 23 and Ex. 19 at 5.) The March 31st performance appraisal also informed Daly that failure to correct the deficiencies identified in the evaluation, by the expiration of the newly imposed probationary period, would result in termination. (Moore Aff. ¶ 23 and Ex. 19 at 5.)

During the course of Daly's four-month post-initial probation, Dr. Moore received additional complaints about Daly's behavior from: (1) Betsy Haley, Director of UNH's Memorial Union Building, with whom Daly had worked on a conference that took place on March 5-7, 1999 (Moore Aff. ¶ 24 and Ex. 20); (2) Elizabethe Plante, Director of the University's Sexual Harassment and Rape Prevention Program (Moore Aff. ¶ 25 and Ex. 21); and (3) Pat Gromley, Special Assistant to the President for Affirmative Action, with whom Daly had also worked on the March conference

(Moore Aff. ¶ 26 and Ex. 22).  During April and May of 1999, Dr. Moore had several conversations and written communications with Daly in which she reminded Daly of her obligation to draft an action plan for improving her interactions with students, staff and faculty.  (Moore Aff. ¶¶ 27, 29-32 and Exs. 25-27.)  At one point, Daly indicated that she was not interested in preparing an action plan, but wanted to be transferred to another position at UNH.  (Moore Aff. ¶ 27.)  Subsequently, when it became apparent that no transfer would be possible, Daly requested specific information on the complaints that had been made against her, as a prerequisite to preparing an action plan.  (Moore Aff. ¶ 30.) Dr. Moore denied her request, citing the confidentiality of the evaluation process.  (Moore Aff. ¶ 30.)

On May 20, 1999, as she was exploring the possibility of a transfer and negotiating with Dr. Moore over what information would be disclosed, Daly filed a formal grievance with David Butler, Assistant Vice President of Human Resources.  Daly's grievance stated, in pertinent part:

11

I am grieving the actions of my supervisor, who having placed me on probation, has violated U.S.Y.V.C.8.3 in that she has failed to provide me a written description of expectations and necessary corrective actions I must take to successfully complete my probationary status.

I further grieve the retaliation taken against me by my supervisor for my awareness of the payroll fraud perpetrated by my supervisor's partner, Deborah Hamilton, who was a part-time employee of my office. Ms. Hamilton is currently employed elsewhere in the University. I have not been told of any action taken against Ms. Hamilton and neither is the incident referenced in my extensive evaluation which curiously includes many dated references as well as patently false characterizations by my supervisor.

(Butler Aff., Ex. 2).

On June 1, 1999 Daly sent Dr. Moore a memorandum which stated, in its entirety:

This memo is written to acknowledge your request for my probationary action plan.

My action plan is to continue to meet my program goals and objectives, and to pursue my grievance.

(Moore Aff., Ex. 28.)

12

Throughout June and July, Dr. Moore continued to ask Daly to submit an action plan, and Daly continued to ask Dr. Moore for specific information about the complaints that had been made against her. (Moore Aff. ¶¶ 34-37 and Exs. 29-32.) When Daly failed to submit an action plan by the end of her latest probationary period, Dr. Moore notified Daly that her employment was being terminated. (Moore Aff. ¶ 38.) Daly's letter of termination stated, in pertinent part:

> Since March 31, we have met on numerous occasions to discuss your performance and the need for you to complete an action plan. On each occasion you have failed to provide the action plan as I have requested. You have communicated both orally and in written letter, your desire to know "specific details" of incidents and have purposely refused to comply with my request to develop a plan. I have warned you that failure to create an action plan would lead to an unsatisfactory probation, and to this date you have not complied with my request.

> It is clear to me that significant aspects of your performance as Director of the Office of Multicultural Student Affairs continue to be unsatisfactory. More importantly, you have not provided any evidence of your willingness to accept responsibility for your performance nor have I seen any significant movement to correct it. Repeated efforts by me and by others to help you improve your performance have not resulted in change on your part. Your refusal to comply with my requests has seriously

13

undermined and eroded any confidence I have in your ability to work in a collaborative relationship with me or other members of the campus community. You continue to debate the issues rather than take needed action to change these unacceptable behaviors or repair your credibility. You have ignored the informal and formal warnings that your behavior is unacceptable and that immediate correction is required.

I am therefore notifying you via this letter that your employment as Director of the Office of Multicultural Student Affairs at the University of New Hampshire is terminated effective July 30, 1999.

(Moore Aff., Ex. 33.) Upon being terminated, Daly amended her grievance to include a claim that she had been discharged in violation of UNH regulations and in retaliation for raising the unethical conduct of Dr. Moore in her pending grievance. (Butler Aff., Ex. 6.) While it is not material to this matter, the court simply notes, in the interest of completeness, that Daly's grievance was unsuccessful.

In response to her termination by UNH, Daly filed this diversity action, alleging wrongful discharge and breach of contract. In her wrongful discharge claim, Daly alleges that she was terminated in retaliation for acquiring and disclosing

14

information concerning the double payment of wages to Dr. Moore's domestic partner, Deborah Hamilton. In her breach of contract claim, Daley alleges that UNH breached the covenant of good faith and fair dealing implied in its employment agreement with her because she was forced, by Dr. Moore, to hire Hamilton, whose subsequent resignation from the OMSA triggered Moore's retaliatory investigation into Daly's job performance, which ultimately led to Daly's termination. Daly has not, however, claimed that UNH failed to provide her with the pre- or post-termination grievance process to which she was entitled by virtue of her employment agreement.

## Discussion

In its Motion for Summary Judgment, UNH argues that: (1) Daly's wrongful discharge claim fails as a matter of law because she was not an employee at will; (2) even if Daly is entitled to bring a wrongful termination claim, such a claim must fail because: (a) she was not terminated in bad faith, with malice or in retaliation, and (b) she was not terminated for engaging in

15

conduct favored by public policy; and (3) Daly's breach of contract claim should be dismissed as a matter of law because: (a) as an at-will employee (which she claims to be for purposes of her wrongful termination claim) Daly had no employment contract that could have been breached by UNH, (b) the undisputed record does not support the factual predicate of her claim, namely that Dr. Moore required Daly to hire Hamilton, (c) the implied covenant of good faith and fair dealing simply does not apply to the factual circumstances of this case, and (d) as a matter of public policy, the court should not act as a "super personnel department," second-guessing UNH's decision to fire Daly.

Daly counters that: (1) she did not have an employment contract with UNH, which means that she is entitled to bring an action for wrongful discharge; (2) she was wrongfully discharged because her termination was in retaliation for doing two things favored by public policy: (a) asking UNH to follow its own policies by providing her with a written corrective action plan,

16

and (b) bringing to light both the improper influence Dr. Moore exerted on her to hire Hamilton and Hamilton's improper receipt of double pay; (3) her job performance was excellent; and (4) because Dr. Moore required Daly to hire Hamilton, UNH breached the implied covenant of good faith and fair dealing by initiating Daly's termination process immediately after Hamilton resigned. In her objection to UNH's Motion for Summary Judgment, Daly identifies no disputed issues of material fact.

Because Daly has identified no disputed issues of material fact, and because UNH is entitled to judgment as a matter of law on both of Daly's claims, its Motion for Summary Judgment is granted.

I.   Relevance of Daly's Employment Status.

UNH seeks judgment on Daly's wrongful discharge claim on grounds that this cause of action is available to at-will employees but not to employees such as Daly, who held a "status appointment" at UNH.  In response, Daly says that a status

17

appointment is not the equivalent of an employment contract. This dispute is beside the point. The tort of wrongful discharge protects an at-will employee from being discharged: (1) out of "bad faith, malice, or retaliation," Wenners v. Great State Beverages, Inc., 140 N.H. 100, 103 (1995) (quoting Short v. School Admin. Unit 16, 136 N.H. 76, 84 (1992)); and (2) because he or she has "performed acts which public policy would encourage or . . . refused to perform acts which public policy would condemn," id.; see generally Harper v. Healthsource New Hampshire, Inc., 140 N.H. 770, 774 (1996); Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 919-20 (1981). Employees subject to employment agreements that specify the duration of employment, or that require their employers to follow a particular process before discharging them, are similarly protected, albeit perhaps under a different legal theory, see Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139-40 (1989) (adopting the elements of wrongful termination as the elements of a cause of action for breach of the implied covenant of good faith and fair dealing in an employment agreement). Because the rights protected by the

18

implied covenant of good faith and fair dealing apply to all employees, not just those employed "at will," the court need not decide, in this case, whether Daly was an at-will employee or was protected by an employment agreement that extended pre-termination rights.[1]

II. Wrongful Discharge.

All New Hampshire employees are protected from being terminated out of bad faith, malice or retaliation and for acting in accordance with the dictates of public policy. Thus, either as a claim for wrongful termination or as one for breach of the implied covenant of good faith and fair dealing, Daly is entitled

---

[1] In arguing that Daly can have no cause of action for wrongful termination, UNH relies upon Censullo v. Brenka Video, Inc., 989 F.2d 40, 42 (1st Cir. 1993) (citing Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 739 (1988)), for the proposition that "[c]ontract employees are limited in their remedies for breach by the terms of the contract." UNH's position, however, is based upon a distinction without a difference. If, strictly speaking, Daly is barred from bringing an action for wrongful termination, she nevertheless enjoyed the rights afforded at-will employees, which were implicit terms of any employment contract she may have had with UNH. Thus, the rule of Censullo does not bar Daly's suit.

19

to challenge her termination on limited grounds.  The problem with Daly's claim, however, is that she has failed to proffer facts sufficient to create a triable issue with regard to the public policy element of a cause of action for wrongful termination.[2]

In her complaint, Daly alleges that she was discharged for acquiring and disclosing knowledge of possible wrongdoing by Hamilton, i.e., that Hamilton may have submitted duplicate pay vouchers for three pay periods.  (Compl. ¶ 29.)  She further claims that her discharge was contrary to public policy because public policy encourages employees to report the wrongdoing of their supervisors.  (Compl. ¶ 30.)  According to the uncontroverted factual record, the only disclosure of any sort that Daly made was contained in the grievance she filed with

_____

[2] Because Daly cannot prove the factual allegations on which she bases her wrongful termination claim, the Court need not reach the legal question whether any of the precipitating acts she alleges to have performed were acts that public policy would encourage, a proposition about which the court has considerable doubt.

20

David Butler.  In that grievance she mentioned Hamilton's payroll irregularities and identified Hamilton as Dr. Moore's partner. Importantly, in her grievance, Daly characterized her probation as Dr. Moore's retaliation for Daly's knowledge of Hamilton's payroll irregularities.

Because Daly was already alleging retaliation due to her knowledge of Hamilton's double payments at the time she filed her grievance, her complaint cannot be read as alleging that she was terminated for making the disclosure contained in the May 20th grievance.  Rather, both the complaint and the grievance must be read as claiming that retaliation was already underway no later than March 31, the date of Daly's final performance evaluation, and Daly herself contends that her mistreatment at the hands of Dr. Moore began immediately after Hamilton resigned from her position at the OMSA (Daly Dep. at 72).  However, the uncontroverted factual record discloses that Daly: (1) never had any independent knowledge of Hamilton's alleged wrongdoing; (2) did not learn about the double payments until February 1999 when

21

she was informed of them by Patsy Stuart; and (3) made no disclosure of this information at any point prior to her May 20th grievance. Thus, Daly has proffered no facts to support a claim that she was disciplined or terminated because of her knowledge or disclosure of Hamilton's alleged wrongdoing. The only colorable disclosure alleged in Daly's complaint is her "disclosure," in the grievance she filed, of the relationship between Dr. Moore and Hamilton. But Dr. Moore and Hamilton were openly living together. Thus, Daly has produced no evidence to support a claim that she was terminated for "disclosing" something hitherto unknown, i.e., the personal relationship between Dr. Moore and Hamilton. In short, as to the claim in her complaint, Daly has not met her burden of showing a triable issue of material fact.

In her objection to UNH's Motion for Summary Judgment, Daly introduces several new theories supporting her claim for wrongful termination, asserting, for example, that she was actually terminated for: (1) demanding that UNH follow its own

disciplinary procedures by providing her with a written corrective action plan; and (2) disclosing to higher authorities, during the course of her termination and grievance processes, the wrongful influence exerted upon her to hire Hamilton and Hamilton's alleged payroll fraud. As to the second of these theories, Daly has produced no evidence of any disclosure other than that contained in her May 20th grievance. Similarly, she has produced no evidence other than her own unsupported conclusion that she was terminated for insisting that Dr. Moore provide her with a written corrective action plan. On the uncontroverted factual record, no reasonable jury could conclude that Daly was fired for anything other than her inappropriate – and often criticized – behavior toward students, staff and faculty, as well as her refusal to comply with the directive of her supervisor to draft a plan for rectifying her inappropriate behavior and the difficulties it caused.

In summary, UNH is entitled to judgment as a matter of law. Whether Daly was or was not a contract employee, she was lawfully

23

discharged.  Daly has failed to identify a triable issue with respect to the public policy element of a cause of action for wrongful discharge; she has provided no evidence of any act by her, favored by public policy, that served as the basis for her termination.

III. <u>Breach of Contract</u>.

The thrust of Daly's breach of contract claim is that UNH breached its implied covenant of good faith and fair dealing because: (1) Dr. Moore required Daly to employ Hamilton; and (2) Daly was terminated as a result of an investigation triggered by Hamilton's resignation from the OMSA and Dr. Moore's presumed resentment toward Daly over Hamilton's apparently negative experience in the OMSA.  As a preliminary matter, the factual record, including Daly's own deposition testimony, does not support the factual predicate of this claim.  There is no evidence from which a jury could conclude that Dr. Moore required Daly to hire Hamilton.  In her deposition, Daly conceded that Dr. Moore never asked her to hire Hamilton.  (Daly Dep. at 184.)  It

24

was Daly, not Dr. Moore, who initiated their single conversation related to Hamilton's possible employment, and it is clear even from Daly's own deposition testimony that Dr. Moore participated in the conversation with the understanding that Daly had already decided to hire Hamilton. Furthermore, even if Dr. Moore had directed Daly to hire Hamilton, Daly has not suggested how such a directive, from her supervisor, would have deprived her of a substantial portion of the value of her employment agreement, see Centronics, 132 N.H. at 143, or breached the implied covenant of good faith and fair dealing in any other way recognized under New Hampshire law. Similarly, Daly has identified no legally cognizable theory under which Dr. Moore acted unfairly or in bad faith by initiating a legitimate administrative investigation into the operation of the OMSA in mid-December of 1998. While that investigation began shortly after Hamilton's departure from the OMSA, contemporaneous problems with the office, including the other student resignation, the Taylor Rental incident, and the resignation of Dr. Ernest from the President's Commission on the Status of People of Color, fully justified Dr. Moore's

25

investigation and subsequent disciplinary action. Daly has failed to meet her burden of producing evidence sufficient to support a trialworthy claim for breach of her employment contract.

**Conclusion**

With respect to Daly's wrongful termination claim, UNH has established that Daly was discharged for lawful reasons related to her unacceptable job performance while Daly has failed to proffer any evidence sufficient to warrant a trial on this issue; nothing in the record supports a claim that Daly was fired for taking some action that public policy would encourage. With respect to Daly's breach of contract claim, she has failed to proffer any evidence supporting her allegation that Dr. Moore required her to hire Hamilton, and has identified no legal theory under which that factual allegation, even if provable, would constitute a breach of contract on the part of UNH. Accordingly, UNH is entitled to judgment as a matter of law on both of Daly's

26

claims.  Defendant's Motion for Summary Judgment (document no. 10) is granted.

The Clerk of the Court shall enter judgment in accordance with the terms of this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 19, 2001

cc:  Paul McEachern, Esq.
     Peter G. Beeson, Esq.

27