Donovan v. Castle Springs          CV-01-413-M    12/20/02
                    UNITED STATES DISTRICT COURT

                       DISTRICT OF NEW HAMPSHIRE


William J. Donovan, III,
        Plaintiff

        v.                                  Civil No. 01-413-M
                                            Opinion No. 2002 DNH 220
Castle Springs, LLC,
        Defendant


                           **O R D E R**


        In this action, which has been removed from the Carroll

County Superior Court, William J. Donovan, III ("Donovan") has

sued Castle Springs, LLC ("Castle Springs") in five counts,

asserting: (1) an overtime wage claim under N.H. Rᴇᴠ. Sᴛᴀᴛ. Aɴɴ. §§

279, et seq. (Count I); (2) a claim under the federal Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201, et seq. (Count II); (3)

breach of contract (Count III); (4) promissory estoppel (Count

IV); and (5) breach of the covenant of good faith and fair

dealing implicit in all New Hampshire contracts (Count V).

Before the court is Castle Springs' motion for summary judgment

on Counts I, III, IV, and V, and for partial summary judgment on

Count II.  Donovan objects, but in doing so, he seeks voluntarily

dismissal of Count I.  For the reasons given below, Castle

Springs' motion for partial summary judgment is granted in part and denied in part.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

<u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." <u>Geffon v. Micrion Corp.</u>, 249 F.3d 29, 34 (1st Cir. 2001) (citing <u>Lucia v. Prospect St. High Income Portfolio, Inc.</u>, 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" <u>Navarro</u>, 261 F.3d at 94 (quoting <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)).

## Factual Background

The facts of this case, viewed in the light most favorable to Donovan, as the non-moving party, are as follows.

3

Donovan was interviewed for the open position of maintenance supervisor by Castle Springs' Executive Vice President of Operations, Mark Wiggins, in late July 1999. Wiggins ultimately offered Donovan the position. Donovan accepted, and began work on August 2. Donovan had learned of the position through a newspaper advertisement which stated, in pertinent part:

> Now accepting applications for a full-time, year-round Maintenance Supervisor. Duties include inside and outside care of estate grounds and plowing during the winter months. Benefits include health, dental, RX card, matching 401K, life insurance, short & long-term disability and vacation.

Castle Springs has submitted, in support of its motion for summary judgment, a substantially more detailed job description, but Donovan states, in his affidavit, that he "was never given a job description other than the advertisement" and was not "sent an offer letter describing [his] employment."

When he interviewed for the position, Donovan asked for a salary of $40,000 per year plus benefits, but was offered, and accepted, a salary of $30,000 per year plus benefits, with the promise that his salary would be reviewed after three months. Donovan was also told that he would have to work long hours

4

during the tourist season at Castle Springs, but that his long hours "would be made up to [him] in the off season." Donovan's salary was paid bi-weekly, at a rate of $576.92 per week.

While the term "at-will employee" was never used during Donovan's employment interview, he signed, on his first day of work, a document titled "Employee Acknowledgment Clause," which states:

> My signature on this page certifies that I have received [the] Castle Spring[s] Inc. <u>Personnel Policy Manual</u> outlining the company's policies, rules and general information. I understand that this manual is not an expressed or implied contract of employment, but rather an overview of working rules and benefits which may be changed at any time at management's discretion.
>
> Furthermore, I acknowledge that my employment is "at will" and is not guaranteed for any particular length of time and that either party remains free to terminate the employment relationship at any time within the guidelines established in the <u>Personnel Policy Manual.</u>

The <u>Personnel Policy Manual,</u> in turn, contains the following relevant provisions:

> Your employment at Castle Springs, Inc. is "at-will" and any statement to the contrary, whether written or verbal, is expressly disavowed unless it is in writing and signed by the Managing General Partner

5

or the Executive Vice President of Operations. This means that you may sever your relationship with Castle Springs, Inc. at any time and for any reason and Castle Springs, Inc. may terminate your employment at any time for any reason.

. . .

All employees are on a trial period for their first three months (90 calendar days) with the company. This trial period gives the company a chance to view employee performance and to assure it is up to company standards. If at any time during the trial period it becomes evident that your performance is not satisfactory, the company may terminate the employment relationship without prejudice.

. . .

Employees will . . . be classified as exempt (salaried) or non-exempt (hourly). Non-exempt employees will receive overtime pay after forty-hours (40) per week. Exempt employees will receive no overtime pay.

. . .

Since employment with this organization is based on mutual consent, both the employee and the employer have the right to terminate employment, at-will, with or without cause, at any time.

Donovan concedes that he signed the "Employee Acknowledgment Clause" and that he received no written statement indicating that he was anything other than an at-will employee, but states that he only skimmed the <u>Personnel Policy Manual</u>.

Donovan worked for Castle Springs, as its maintenance supervisor, from August 2, 1999, through November 19, 1999, when he was terminated.  During the course of his employment, Donovan supervised two full-time employees (Wills Clinton, who worked for Castle Springs for the whole of Donovan's tenure, and Adam Clough, who was employed by Castle Springs for the first four weeks of Donovan's tenure) and three part-time employees.  He also supervised maintenance work performed by workers assigned to him (from Castle Springs' bottling plant) on an as-needed basis, and oversaw Castle Springs' half-dozen tram drivers, at least to the extent of co-ordinating their scheduling and filling in when no regular tram drivers were able to work.  Donovan's supervisory activities occupied approximately ten to fifteen percent of his time; the remainder of his time was spent performing the same kinds of manual labor and other maintenance tasks that his two subordinates performed.  While Donovan earned a salary and was provided benefits, all the employees he supervised, including Clinton and Clough, were paid on an hourly basis and did not have benefits.

In nine of the eleven workweeks from August 2, 1999, through October 17, 1999, the employees performing maintenance duties under Donovan's supervision, worked, in the aggregate, no fewer than eighty hours per week. Taking into account the tram drivers, employees under Donovan's supervision worked no fewer than 220 hours per week (collectively) during that time period. As for Donovan, from August 2 through November 19, the date on which he was terminated, he worked a total of 1119.5 hours, which is 479.5 hours more than he would have worked had he put in forty-hour workweeks.[1]

As noted, Donovan was terminated on November 19, 1999, during the course of a conversation with his supervisor, Mark Wiggins. That conversation took place approximately two and one-half weeks after Donovan's three-month trial period had expired. When Donovan asked Wiggins why he was being terminated, Wiggins said simply that things had not worked out.

---

[1] Castle Springs maintained no records of Donovan's hours, presumably because he was a salaried employee; Donovan kept a personal record of the hours he worked.

In response to his termination, Donovan filed this suit, in which he seeks: (1) payment of $10,371.58 for 479.5 hours of uncompensated overtime, under the FLSA (Count II); (2) contract damages, including full salary for the period from November 20, 1999, through August 1, 2000, under three different theories: breach of contract (Count III); promissory estoppel (Count IV); and breach of the implied covenant of good faith and fair dealing (Count V).[2]

**Discussion**

Castle Springs moves for summary judgment on Counts III, IV, and V, and for partial summary judgment on Count II, on the theory that Donovan was entitled to overtime pay under the FLSA only after October 17, 1999. The court considers each of Donovan's claims in turn.

I.   Count II: Unpaid Overtime under the FLSA

In this count, Donovan argues that under the FLSA, Castle Springs is obligated to pay him, at the rate of time and one-

---

[2] As noted above, Donovan has voluntarily dismissed Count I, which asserted a claim under RSA chapter 279.

9

half, for the 479.5 hours he worked in excess of a standard forty-hour workweek.[3]  Castle Springs contends that because Donovan was employed in a bona fide executive capacity until October 17, the overtime provisions of the FLSA did not apply to him during the period from August 2 through October 17.[4]  Donovan counters that he was not exempt from the overtime provisions of the FLSA because he devoted no more than fifteen percent of his work time to management functions.

According to the "maximum hours" provision of the Fair Labor Standards Act:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not

---

[3] Donovan calculates the amount of overtime pay he is due by dividing his weekly salary by forty, to establish an hourly rate, and then multiplying the number of hours he worked in excess of forty per week by 1.5 times his calculated hourly rate of pay.

[4] For purposes of summary judgment, Castle Springs concedes that it cannot produce undisputed evidence that Donovan was exempt from the FLSA after October 17, because from that date onward, he no longer supervised the equivalent of two full-time employees.

less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a).


The statutory rate of overtime pay, "one and one-half times the regular rate," is subject to several different modes of calculation, including one for employees paid a weekly salary for a fixed number of hours, see 29 C.F.R. § 778.113(a), and another for employees paid a fixed salary for fluctuating hours, see 29 C.F.R. § 779.114. See generally Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 38-40 (1st Cir. 1999). Under the first mode of calculation, an employee whose salary is $400 for a 40-hour week, and who works 50 hours, is entitled to $150 in overtime pay ($400 per week, divided by 40 hours (the fixed workweek), for an hourly rate of $10, times 1.5, yielding an overtime rate of $15 per hour, multiplied by 10 hours of overtime). Under the second mode of calculation, an employee whose salary is fixed at $400 per week, for fluctuating hours, and who works 50 hours, is entitled to only $40 in overtime pay ($400 per week divided by 50 hours (the actual hours worked, for which the weekly salary was paid),

for an hourly rate of $8, times .5, for an overtime premium of $4 per hour, times 10 hours of overtime).[5]

However, while the FLSA requires that certain employees be paid overtime, the overtime provisions of the FLSA "shall not apply with respect to . . . any employee employed in a bone fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by

---

[5] The regulation pertaining to overtime for workers paid a fixed salary for fluctuating hours provides, in pertinent part:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, <u>and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay</u>.

29 C.F.R. § 778.114(a) (emphasis added).

12

regulations of the Secretary [of Labor] . . . ." 29 U.S.C. §
213(a)(1). Castle Springs does not argue that Donovan was
employed in an administrative or professional capacity, but that
he was employed in an executive capacity. And because Donovan
earned more than $250 per week, see 29 C.F.R. § 541.1(f), both
parties agree that the proper test for determining whether he was
an exempt executive employee is the so-called "short form" test.
That test defines an "employee employed in a bona fide executive
. . . capacity" as "any employee . . . whose primary duty
consists of the management of the enterprise in which the
employee is employed or of a customarily recognized department or
subdivision thereof, and includes the customary and regular
direction of the work of two or more other employees therein . .
. ." Id. (emphasis added); see also 29 C.F.R. § 541.119
(explaining application of the "short form" test for "high
salaried executives").

As for the kinds of work that constitute "management," the
interpretive section of the regulations provides that:

> it is generally clear that work such as the following
> is exempt work when it is performed by an employee in
> the management of his department or the supervision of

13

the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102. The regulations also characterize the direction of two or more employees as the supervision of "at least two full-time employees or the equivalent." 29 C.F.R. § 541.105.

Of greater significance to this case is the regulatory interpretation of the phrase "primary duty." Whether an employee's primary duty is management involves a fact-specific inquiry, made on a case-by-case basis. See 29 C.F.R. § 541.103. While "[t]he amount of time spent in the performance of the managerial duties is a useful guide," and "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means

14

the major part, or over 50 percent, of the employee's time . . . [t]ime alone . . . is not the sole test." Id. According to the regulations, even an employee who spends less than fifty percent of his or her time performing managerial duties can be considered to be employed in an executive capacity based upon an analysis of other "pertinent factors" such as:

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

Id.


To state the legal test for determining whether Castle Springs employed Donovan in a bona fide executive capacity is to demonstrate why the court must deny Castle Springs' motion for partial summary judgment on Donovan's FLSA claim. Specifically, there are at least three issues of material fact that preclude judgment in favor of Castle Springs: (1) the portion of Donovan's work that qualified as managerial; (2) whether managerial work was Donovan's primary duty (which would appear to entail a

15

balancing of the time Donovan spent on his managerial duties against the other pertinent factors listed above); and (3) whether Donovan's oversight of the tram drivers rose to the level of supervision, or, alternatively, constituted only non-managerial record keeping, scheduling, or coordination. While the primary evidence Donovan provides to support his objection to summary judgment is his own affidavit, that is enough to create a triable issue of fact sufficient to defeat Castle Springs' motion for partial summary judgment on Count II.

Finally, the court notes that should Donovan prevail on his claim to non-exempt status and, as a consequence, that the FLSA required Castle Springs to pay him overtime, it appears that a strong argument can be made that he would qualify only for the overtime rate set out in 29 C.F.R. § 778.114(a) (for non-exempt employees paid a fixed salary for fluctuating hours), rather than the more traditional version of the time-and-one-half rate described in § 778.113(a) (for non-exempt employees paid a weekly salary for a fixed number of hours). In other words, it may be (subject to proof of a "clear mutual understanding," 29 C.F.R. § 778.114(a)) that even if Donovan were to succeed on his claim to

16

payment for overtime hours, he would be due approximately $1,810, rather than the $10,371.58 he seeks.

## II.   Count III: Breach of Contract

In Count III, Donovan claims that Castle Springs breached his employment contract when it refused to retain him for a full year.  In essence, he claims that Castle Springs enticed him away from his previous employment by promising him a full year's work, and then reneged on its promise.  Based upon his breach of contract theory, Donovan seeks, among other damages, payment of his salary from November 20, 1999, through August 1, 2000. Castle Springs moves for summary judgment on grounds that Donovan was not contractually entitled to employment for one year, but was an employee at will.  Donovan counters that triable questions of fact precluding summary judgment are created by: (1) Castle Springs' representations that: (a) he would be paid a yearly salary; (b) his three-month review was for the purpose of determining whether he would receive a raise (not whether he would be allowed to keep his job);[6] and (c) his hard work during

_____

[6] Donovan also appears to suggest that even if he was subject to termination during a three-month trial period, his termination came more than two weeks after he had been employed for three months, thus taking his employment outside the trial-

17

the tourist season would be "made up" to him during the off season; and (2) the flimsiness of the reasons given for his termination, which Donovan characterizes as a pretext for terminating him prior to the time when Castle Springs would have been obligated to give him compensatory time in exchange for the overtime he worked during the tourist season. Because the undisputed factual record establishes that Donovan was an at-will employee, Castle Springs is entitled to summary judgment on Count III.

Donovan's breach of contract claim depends, of course, upon the existence of an enforceable contract under New Hampshire law. Donovan argues, in his memorandum of law in opposition to summary judgment, that "[a]lthough there was no guarantee as to a specific period of employment, plaintiff reasonably expected to be employed for at least the year of his quoted salary so long as he performed his job satisfactorily." (Mem. of Law Supp. Pl.'s Obj. to Def.'s Part. Mot. Summ. J., at 10.) That expectation was not reasonable, however, given the "Employee Acknowledgment

period termination provision set out in the Personnel Policy Manual. Because Donovan was an employee at will, as the court explains more fully below, the timing of his termination is not pertinent.

18

Clause" Donovan signed, which explicitly provided that: (1) his employment was "at-will;" and (2) both parties retained the right to terminate the employment relationship at any time. Donovan's expectation that he was entitled to keep his job so long as he performed well, or, conversely, that he could be discharged only for poor performance, is simply insufficient to overcome the express terms of the Employee Acknowledgment Clause he admits to having signed.

Furthermore, while Donovan emphasizes the fact that he was told that he would be paid a yearly salary, "[a] hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed for whatever time the party may serve." Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 919 (1981) (quoting H.G. WOOD, A TREATISE ON THE LAW OF MASTER AND SERVANT § 136, at 283-84 (2d ed. 1886)). In other words, "a general or indefinite hiring is prima facie a hiring at will." Id. Nothing presented suggests or supports any other legal conclusion but that Donovan was an at will employee.

19

In summary, based upon the undisputed factual record, construed in the light most favorable to Donovan, Donovan did not have a one-year employment contract under New Hampshire law. He was an employee at will. Because Donovan was an employee at will, Castle Springs' decision to terminate him before he had completed a full year did not constitute a breach of contract.[7] Accordingly, Castle Springs' motion for summary judgment is granted as to Count III, Donovan's breach of contract claim.

III. Count IV: Promissory Estoppel

In Count IV, Donovan relies upon the doctrine of promissory estoppel to establish Castle Springs' obligation to pay him a full year's salary. According to Donovan's complaint, Castle Springs "led [him] to believe that he would be employed for at least a year, based upon the statement of his yearly salary and the representation that he could have time off during the remainder of the one year period as the busy season would require him to work in excess of 40 hours per week." Castle Springs argues that promissory estoppel is inapplicable where, as here,

_____

[7] Obviously, even the termination of an at-will employee can be actionable, under limited circumstances. But Donovan does not make out a claim for wrongful termination under New Hampshire law.

20

the party against whom estoppel has been asserted is not alleged to have made any promise.  The court agrees.

Promissory estoppel is a doctrine that courts use "to enforce promises when consideration is lacking."  <u>Great Lakes Aircraft Co. v. City of Claremont</u>, 135 N.H. 270, 290 (1992) (citation omitted).

> More recently, however, its application has been
> expanded to enforce promises underlying otherwise
> defective contracts and promises made during the course
> of preliminary negotiations.  In some instances, it has
> been employed to provide a remedy for reliance upon
> offers subsequently withdrawn.  CALAMARI AND PERILLO, [THE
> LAW OF CONTRACTS,] § 6-5 [(3d ed. 1987)]. . . .  It
> serves to impute contractual stature based upon an
> underlying promise, and to provide a remedy to the
> party who detrimentally relies on the promise.  2A
> CORBIN ON CONTRACTS § 196A, at 55-56 (Supp. 1991).

<u>Great Lakes Aircraft</u>, 135 N.H. at 290.  According to the Restatement, which the New Hampshire Supreme Court regards as authoritative on this topic, <u>see</u> <u>Marbucco Corp. v. City of Manchester</u>, 137 N.H. 629, 633 (1993),

> A promise which the promisor should reasonably
> expect to induce action or forbearance on the part of
> the promisee or a third person and which does induce
> such action or forbearance is binding if injustice can
> be avoided only by enforcement of the promise.  The

> remedy granted for breach may be limited as justice
> requires.

RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981).

Here, there simply was no promise.  Castle Springs offered Donovan an annual salary, but did not promise him employment for one year.  See Cloutier, 121 N.H. at 919.  Similarly, Castle Springs discussed Donovan's wintertime duties and the nature of his work during the off season not because it was promising him work for a year, but because it was seeking to hire a year-round maintenance supervisor.  Moreover, Donovan himself concedes that "there was no guarantee as to a specific period of employment." Because promissory estoppel requires a promise to have been made by the party against whom estoppel is sought, and because Donovan has identified no promise made by Castle Springs and has produced no evidence from which a reasonable jury could find that Castle Springs promised him a full year's employment, see Navarro, 261 F.3d at 94 (citations omitted), defendant's motion for summary judgment is granted as to Count IV.

22

IV.   Count V: Breach of the Implied Covenant of Good Faith and
      Fair Dealing

In Count V, Donovan asserts that Castle Springs breached its duty of good faith and fair dealing by inducing him to leave his former employment and then failing to keep the promises that formed the inducement on which he relied.  The complaint does not say so explicitly, but the court presumes that Donovan claims to have been induced to come to work for Castle Springs by a promise of employment for a year, as well as by a promise of less work during the winter months, in exchange for more work during the tourist season.  Castle Springs argues that: (1) Donovan fails to state a claim for breach of the covenant of good faith and fair dealing implied in every New Hampshire contract because he had no employment contract with Castle Springs;[8] and (2) even if there were an employment agreement, Donovan has produced no evidence to show that Castle Springs breached it.  Without necessarily

_____

   [8] While Castle Springs correctly states the rule that the covenant of good faith and fair dealing only exists when there is an underlying contract into which it may be implied, this is not a case in which there was "no contract" between the parties.  The court has ruled that Castle Springs did not agree to employ Donovan for a year, but there was, nonetheless, an employment agreement, specifically, "a contract for employment at-will." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 140 (1989).

23

adopting all of Castle Springs' reasoning, the court agrees that Castle Springs is entitled to summary judgment on Count V.

As a preliminary matter, it should be noted that, as pled, Count V does little more than assert that Castle Springs treated Donovan unfairly and in bad faith by breaching its employment agreement with him.  On that basis, Count V is indistinguishable from Donovan's breach of contract claims.  Recognizing, however, that Donovan likely intended to plead something above and beyond his breach of contract claim, the court turns to the law of good faith and fair dealing.

Under New Hampshire law, an implied duty of good faith and fair dealing arises "in three distinct categories of contract cases:  [1] those dealing with standards of conduct in contract formation, [2] with termination of at-will employment contracts, and [3] with limits on discretion in contractual performance." Centronics, 132 N.H. at 139.  Donovan's complaint does not disclose which of the three duties of good faith he believes to have been breached by Castle Springs, but his objection to Castle Springs' motion for summary judgment appears to identify the

24

first and the third.  Again, in the interest of accepting all plausible inferences favorable to Donovan, each type of implied duty will be examined in order.

With respect to the duty of good faith in contract formation, the New Hampshire Supreme Court has explained:

> In our decisions setting standards of conduct in contract formation, the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it.

Centronics, 132 N.H. at 139 (citing Bursey v. Clement, 118 N.H. 412, 414 (1978)).  In other words, to make out a claim under this branch of the covenant of good faith and fair dealing, a plaintiff must allege a misrepresentation made by the defendant that induced him or her to enter into a contract.  One acts in bad faith, under these circumstances, by making a promise, without any intention of keeping it, for the purpose of inducing another to enter into a contract.  See Hydraform Prods. Corp. v. Am. Steel & Aluminum Corp., 127 N.H. 187, 200 (1985) (citations

25

omitted).[9]  Conversely, all one needs to do to act in good faith, at contract formation, is to have the intention and the capacity to keep the promises one makes.  Here, Donovan argues that a jury could find bad faith based upon Castle Springs' intention, at the time of contract formation, not to honor its promise of a full year's employment.  However, because Castle Springs made no promise of a full year's employment, by Donovan's own admission, it could not have acted in bad faith by making a promise that it did not intend to keep.  Thus, Donovan's claim under the first branch of the good faith doctrine could not survive a 12(b)(6) motion to dismiss under FED. R. CIV. P. 12(b)(6).  Furthermore, even assuming that Castle Springs had promised Donovan a full year's employment, he has produced no evidence, other than his own belief, that Castle Springs did not intend to employ him for

---

[9] In Hydraform Products, the New Hampshire Supreme Court explained:

> While a promise is not a statement of fact and hence cannot, as such, give rise to an action for misrepresentation, a promise can imply a statement of material fact about the promisor's intention and capacity to honor the promise.  It follows that mere proof of breach of promise, whether or not the promise is a contractual term, will not support an action for misrepresentation.

127 N.ah. at 200.

a full year when it promised to do so.  Accordingly, even if he had stated a claim on which relief could be granted, that claim could not survive summary judgment.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (explaining that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams").

Donovan does not appear to invoke the second branch of the implied covenant of good faith doctrine, which concerns the termination of at-will employment.  Under the second branch, "an employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy."  Centronics, 132 N.H. at 140 (citing Cloutier, 121 N.H. at 921-22).  Because Donovan comes nowhere close to identifying any public policy that might be offended by his termination, the court need say no more about the second branch.

With regard to the third branch, governing the exercise of discretion in contract performance, the New Hampshire Supreme Court has developed the following rule:

> under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Centronics, 132 N.H. at 143. Adoption of that rule rested in part on a case decided under New York law, holding that "an otherwise unregulated right to discharge [is] limited [by the implied covenant of good faith and fair dealing] so as to preclude the employer from depriving his employee of contract consideration to which the employee had already become entitled by virtue of his own performance." Id. (citing Wakefield v. Northern Telecom, Inc., 769 F.2d 109 (2d Cir. 1985)). In Wakefield, "an employer was held to have violated good faith in firing an employee for the sake of taking advantage of a contract clause extinguishing the employee's right to accrued commissions upon discharge." Centronics, 132 N.H. at 143 (citation omitted).

28

Castle Springs did not breach the implied covenant of good faith and fair dealing by terminating Donovan less than a year after he was hired. Donovan neither alleged nor established facts under which continuing employment (up to one year) could possibly be characterized as "contract consideration to which [Donovan] had already become entitled by virtue of his own performance." Centronics, 132 N.H. at 143. Furthermore, Donovan has not created a triable issue of fact by asserting that he is somehow owed additional compensation, under his at-will employment agreement, for the long hours he worked during the tourist season.

According to Donovan, Wiggins told him that his "long hours . . . during the tourist season . . . would be made up to [him] in the off season." To the extent that statement might be construed as something more than a mere description of Donovan's duties, and amounted to an enforceable term of his at-will employment agreement, the only "contract consideration to which [Donovan became] entitled by virtue of his own performance," Centronics, 132 N.H. at 143 (citation omitted), other than his salary, was the right to have his long hours "made up" to him

29

during the off season.  But entitlement to that consideration
necessarily presupposes his employment in the off season.[10]
While Donovan now argues that his long hours were to have been
"made up" by means of a specific form of compensatory time (i.e.,
one winter season hour off for every tourist season hour worked
over some set number in a given week), he has produced no
evidence to support such a claim.  He attributes no such specific
promise to Wiggins or any other representative of Castle Springs,
and, interestingly, while Donovan has produced personal records
he kept of the hours he worked, no comparable records were
maintained by Castle Springs.  Donovan does not assert that
Castle Springs directed him to keep records of his own time to
facilitate implementation of the specific compensatory time plan
Donovan claims to have been working under.  Thus, Donovan has
produced no admissible evidence from which a reasonable jury
could conclude that he had been promised specific compensatory
time, or that, should his employment be terminated, accrued

---

[10] The court has already explained that Wiggins' promise
that Donovan's long hours would be "made up" during the off
season was insufficient, as a matter of law, to transform
Donovan's employment at will into employment for a fixed term.
Thus, that promise posed no obstacle to Donovan's termination.

compensatory time would be paid for at his regular salary rate, or at some other rate.

Because Donovan has produced no evidence from which a jury could conclude that he was promised compensatory time or that Castle Springs even knew how much "compensatory time" he had "earned," his termination could not plausibly be deemed a breach of the implied covenant of good faith and fair dealing, which, under its third branch, requires the termination at issue to have been motivated by the employer's specific intent to deprive the employee of compensation that he or she had already earned. See Centronics, 132 N.H. at 143; Wakefield, 769 F.2d at 112-13. That is, without knowledge of the amount of Donovan's accrued "compensatory time," and absent a belief that Donovan was entitled to set compensatory time in the first place, there is simply no logical basis for a claim that Castle Springs terminated Donovan in an attempt to avoid its obligation to compensate him.

Finally, while Castle Springs has produced evidence demonstrating that it terminated Donovan because of

dissatisfaction with his job performance, Donovan has produced no evidence, other than his own conjecture, from which a reasonable jury could conclude that he was terminated for the purpose of relieving Castle Springs of the obligation to compensate him for the long hours he worked during the tourist season (presumably by paying him his regular salary while he worked fewer than normal hours in the off season). Obviously, direct evidence of intent is difficult to obtain, but Donovan has not even pointed to circumstantial evidence, such as evidence that he was replaced in the off season by a part-time hourly employee rather than another full-time salaried maintenance supervisor.

In summary, Donovan has failed to create a triable issue of fact with respect to the third branch of the implied covenant of good faith and fair dealing; he points to no facts from which a reasonable jury could conclude that Castle Springs terminated him in order to avoid providing compensatory time he had earned.

## Conclusion

For the reasons given above, Castle Springs' motion for partial summary judgment (document no. 10) is granted in part and

denied in part.  Specifically, Castle Springs is entitled to summary judgment on Counts III, IV, and V.  On the other hand, Donovan is entitled to proceed to trial on his FLSA claim (Count II).  However, as the court has explained, it may be that even if Donovan prevails on his FLSA claim, he would be entitled to recover approximately $1,800 rather than the $10,371.58 he seeks (assuming he is found to be a non-exempt employee paid a salary for fluctuating work weeks).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 20, 2002

cc:  Leslie H. Johnson, Esq.
     Mark T. Broth, Esq.